## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

**RITA AND PAM JERNIGAN AND**
**BECCA AND TARA AUSTIN**                                        **PLAINTIFFS**

**v.**

**LARRY CRANE, In His Official Capacity**
**As Circuit And County Clerk For Pulaski County**
**And His Successors In Interest; RICHARD WEISS,**
**In His Official Capacity As Director Of The Arkansas**
**Department Of Finance And Administration,**
**And His Successors In Interest; GEORGE HOPKINS,**
**In His Official Capacity As Executive Director Of**
**The Arkansas Teacher Retirement System And His**
**Successors In Interest; DUSTIN McDANIEL, In His**
**Official Capacity As Attorney General For The State**
**Of Arkansas And His Successors In Interest**                   **DEFENDANTS**

### PLAINTIFFS' RESPONSE IN OPPOSITION TO SEPARATE DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Arkansas law discriminates against same-sex couples through its constitutional and statutory ban on same-sex marriage ("Marriage Ban") and refusal to recognize valid same-sex marriages legally performed in other states ("Anti-Recognition Laws"). These laws violate Plaintiffs' fundamental privacy rights protected under the Due Process Clause, as well as Plaintiffs' rights to equal protection.

In a landmark decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013), the Supreme Court invalidated Section 3 of the federal Defense of Marriage Act ("DOMA"), wherein Congress had defined "marriage" for purposes of all federal laws to include only marriages of opposite-sex couples. The *Windsor* Court held that DOMA "violate[d] basic due process and equal protection principles." *Id*. at 2693. Such interference with same-

sex couples' fundamental rights cannot withstand constitutional scrutiny when, as in the present case, "no legitimate purpose overcomes the purpose and effect to disparage and to injure" same-sex couples. *Id.* at 2696. Although *Windsor* addressed a federal anti-recognition law, the Court noted that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons." 133 S. Ct. at 2691.

Federal courts around the country since *Windsor* have unanimously agreed. *See Bostic v. Rainey*, Case No. 2:13-cv-395, Doc. No. 139 (E.D. Va. Feb. 14, 2014); *Bourke v. Beshear*, Case No. 3:13-cv-750, Doc. No. 47 (W.D. Ky. Feb. 12, 2014); *Bishop v. Holder*, 2014 WL 116013 (N.D. Okla. Jan. 14, 2014); *Obergefell v. Wymyslo*, 2013 WL 6726688 (S.D. Ohio Dec. 23, 2013); *Kitchen v. Holder*, 2013 WL 6697874 (D. Utah Dec. 20, 2013); *Gray v. Orr*, 2013 WL 6355918 (N.D. Ill. Dec. 10, 2013); *Whitewood v. Wolf*, 1:13-CV-01861-JEJ (M.D. Pa. Nov. 15, 2013); *Obergefell v. Kasich,* 2013 WL 3814262 (S.D. Ohio July 22, 2013); *Bassett v. Snyder*, 2013 WL 3285111 (E.D. Mich. June 28, 2013). This Court should do the same. As the Eastern District of Virginia stated in *Bostic v. Rainey*, Case No. 2:13-cv-395, Doc. No. 136 at *39 (E.D. Va. Feb. 14, 2014), "[w]e have arrived upon another moment in history when *We the People* becomes more inclusive, and our freedom more perfect."

I.   **Introduction**

Arkansas's Marriage Ban and Anti-Recognition Laws impermissibly infringe upon Plaintiffs' constitutionally-protected rights associated with marriage. As the Supreme Court has repeatedly stated, the right to marry is "one of the 'basic civil rights of man'" protected by the Due Process Clause. *Loving*, 388 U.S. at 12 (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)). "Choices about marriage . . . are among

associational rights [the Supreme] Court has ranked as of basic importance to our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996)(plurality opinion)(internal citation and punctuation omitted). Contrary to Defendants' argument, "Plaintiffs do not seek recognition of a new right," *Perry v. Schwarzenegger*, 705 F. Supp. 2d 921, 993 (N.D. Cal. 2010). "Like all fundamental rights, the right to marry vests in every American citizen." *Kitchen v. Herbert*, 2013 WL 6697874, at *13 (D. Utah Dec. 20, 2013)(citing *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)). Plaintiffs simply seek to enjoy "the basic civil right[]" of marriage like opposite-sex couples.

Plaintiffs Becca and Tara Austin are in an exclusive long term relationship and have two children. Arkansas's Marriage Ban violate the Austins' fundamentally-protected liberty interests, including the right to marry and to form intimate relationships, as well as their rights to equal protection. Plaintiffs Rita and Pam Jernigan are in a long-term exclusive relationship and recently travelled to Iowa to be married after Defendant Larry Crane denied their application for a marriage license. In addition to violating the Jernigans' right to due process and equal protection as stated above, Arkansas's refusal to recognize the Jernigans' valid out-of-state marriage violates their constitutionally-protected liberty interest in their existing marriage, violates their right to travel, and violates equal protection guarantees by treating them differently than all other legally married couples.

A.   **The Supreme Court's Landmark Decision in Windsor**

On June 26, 2013, the United States Supreme Court issued an historic decision in *Windsor*, 133 S. Ct. 2675, holding that a law that refused federal recognition of valid

same-sex marriages "violate[d] basic due process and equal protection principles." *Id.* at 2693. "[T]he decision of the United States Supreme Court in *Windsor* was not unprecedented. The Court relied upon its equal protection analysis from a 1996 case holding that an amendment to a state constitution, ostensibly merely prohibiting any special protections for gay people, in truth violated the Equal Protection Clause under even a rational basis analysis." *Obergefell v. Wymyslo*, 2013 WL 6726688 (S.D. Ohio Dec. 23, 2013)(citing *Romer v. Evans,* 517 U.S. 620 (1996)). The Court also held that such laws constitute "a deprivation of the liberty of the person" protected by the Due Process Clause. *Windsor*, 133 S. Ct. at 2695. The Court echoed *Loving,* noting that such discrimination "demeans the couple, whose moral and sexual choices the Constitution protects." *Id.* at 2694 (citing *Lawrence v. Texas*, 539 U.S. 558 (2003)).

*Windsor* suggests that some form of heightened scrutiny must be applied to laws that discriminate against same-sex couples. Specifically, the *Windsor* Court held that "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Windsor*, 133 S. Ct. at 2692. The Court conducted this "careful consideration" analysis and concluded that DOMA singled out a subset of legally married persons for no reason other than to disadvantage this class of persons and to ensure that they did not receive any federal rights or benefits associated with marriage. The Court thus found no legitimate purpose that could "overcome[] the purpose and effect to disparage and injure" same-sex couples. *Id.* at 2696.

*Windsor* is directly applicable to state regulation of marriage. Although states typically reserve the right to regulate marriage, *Windsor* makes clear that that a state's

regulation of marriage "must respect the constitutional rights of persons." *Windsor*, 133 S. Ct. at 2691; *see also*, *Loving*, 388 U.S. at 7 (rejecting a similar argument that the state's "powers to regulate marriage are unlimited notwithstanding the commands of the Fourteenth Amendment"). Justice Scalia even stated in his dissent that "the view that *this* Court will take of state prohibition of same-sex marriage is indicated beyond mistaking in today's opinion." *Windsor*, 133 S. Ct. at 2709 (Scalia, J., dissenting). Thus, the State must respect that same-sex couples have a constitutionally-protected liberty interest in their marriages. Any infringement upon that is "unconstitutional as a deprivation of the liberty of the person protected by the [Fourteenth] Amendment of the Constitution." *Id.* at 2695.

### B.     *Courts Across the Country are Following Windsor and Applying Its Holding to State Marriage Ban and Anti-Recognition Laws*

The Supreme Court in *Windsor* started a national push to invalidate state laws similar to the law that the Court struck down in *Windsor*. As Justice Scalia foreshadowed, federal courts have unanimously followed *Windsor* and applied its holding to state constitutional amendments and statutes that prohibit same-sex marriage and that refuse recognition of lawful same-sex marriages entered into in other states. These decisions have rested on both due process and equal protection grounds. The overwhelming conclusion from these recent cases is that *Windsor* changed the landscape for same-sex couples and provides an avenue by which courts may end discrimination and animus directed at same-sex couples. Some courts have even granted preliminary injunctive relief based on the guidance set forth in *Windsor*, finding that the deprivation of the fundamental rights resulting from such laws constitutes irreparable harm. *See*, *e.g.*, *Kasich,* 2013 WL 3814262; *Gray*, 2013 WL 6355918.

Federal courts have unanimously held that discriminatory laws targeting same-sex couples cannot stand in light of *Windsor*. The District of Utah struck down a marriage ban law as a violation of both due process and equal protection, holding that "[i]f, as is clear from the Supreme Court cases discussing the right to marry, a heterosexual person's choices about intimate association and family life are protected from unreasonable government interference in the marital context, then a gay or lesbian person also enjoys these same protections." *Kitchen v. Herbert*, 2013 WL 6697874 (D. Utah Dec. 20, 2013). "The alleged right to same-sex marriage that the State claims the Plaintiffs are seeking is simply the same right that is currently enjoyed by heterosexual individuals." *Id.*; *see also*, *Bishop v. Holder*, 2014 WL 116013 (N.D. Okla. Jan. 14, 2014)(striking down a state constitutional marriage ban as a violation of equal protection, holding that "the majority view in Oklahoma must give way to individual constitutional rights."); *Obergefell v. Wymyslo*, 2013 WL 676688 (S.D. Ohio Dec. 23, 2013)("in derogation of law, the Ohio system has unjustifiably created two tiers of couples."). The *Bishop* court warned that "courts reviewing marriage regulations, by *either* the state or federal government, must be wary of whether 'defending' traditional marriage is a guise for impermissible discrimination against same-sex couples." *Bishop*, 2014 WL 116013 (emphasis in original).

Two (2) additional courts issued similar opinions just this week. The Western District of Kentucky struck down a constitutional amendment and several state statutes prohibiting recognition of same-sex marriages holding that "[t]he principal purpose is to impose inequality." *Bourke v. Beshear*, Case No. 3:13-cv-750, Doc. No. 47 (W.D. Ky. Feb. 12, 2014)(quoting *Windsor*, 133 S. Ct. at 2694). The Kentucky court, although not

presented with a Marriage Ban law, indicated that *Windsor* would require striking down such laws as well. On February 14, 2014, the Eastern District of Virginia granted summary judgment for the plaintiffs and struck down a Virginia constitutional amendment and related statutes banning same-sex marriage in the state, noting that "[w]e have arrived upon another moment in history when *We the People* becomes more inclusive, and our freedom more perfect." *Bostic v. Rainey*, Case No. 2:13-cv-395 (E.D. Va. Feb. 14, 2014).

All federal courts to consider this issue agree that state Marriage Ban and Anti-Recognition Laws cannot satisfy even rational basis review. *See Bourke*, Case No. 3:13-cv-750,  Doc. No. 47 (W.D. Ky. Feb. 12, 2014)("[u]ltimately, the result in this case is unaffected by the level of scrutiny applied"); *Kitchen*, 2013 WL 6697874 ("State of Utah has not demonstrated a rational, much less a compelling, reason why the Plaintiffs should be denied their right to marry."); *Bassett v. Snyder*, 951 F. Supp. 2d 939, 969 (E.D. Mich. 2013)(anti-recognition law not "rationally related to a legitimate governmental purpose"). As the District of Utah noted in *Kitchen*, "[t]he Supreme Court's decision in *Lawrence* removed the only ground—moral disapproval—on which the State could have at one time relied to distinguish the rights of gay and lesbian individuals from the rights of heterosexual individuals." 2013 WL 6697874.

## C.   *Arkansas has a Rich History of Recognizing and Protecting the Sanctity of Marriage, Unless Such Marriage is a Same-Sex Marriage*

Arkansas's categorical ban of same-sex marriage and refusal to recognize valid same-sex marriages performed in other states is an unprecedented departure from Arkansas's history of honoring the sanctity of marriage. For well over a century, Arkansas has recognized and honored marriages validly entered into in other

jurisdictions. *See* Ark. Rev. Stat. ch. 94 § 7 (1837)(All marriages contracted without this State, which would be valid by the laws of the State or country in which the same were consummated, and the parties then actually resided, shall be valid in all courts in this State."). Arkansas maintained this explicit statutory recognition of out-of-state marriages for one hundred and sixty (160) years, even during the period when miscegenation was criminalized. *See* C. & M. Dig. § 7043; Pope's Dig. § 9023; Ark. Stat. Ann. § 55-110 (1947).[1]

The general rule—known as the place of celebration rule—"is recognized in every state, and thus it has become a defining feature and basic incident of American marriage." Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage,* 110 Mich. L. Rev. 1421, 1434 (2012)(hereinafter Sanders); *see also*, *e.g.*, *McConnell v. McConnell*, 99 F. Supp. 493, 494 (D.D.C. 1951)("The general and apparently universally accepted rule is that the validity of a marriage is to be determined by the law of the place of the celebration of the marriage"). The rule "recognizes that individuals order their lives based on their marital status and 'need to know reliably and certainly, and at once, whether they are married or not.'" Sanders, 110 Mich. L. Rev. at 1434 (quoting Luther L. McDougal III et al., *American Conflicts Law* 713 (5th ed. 2001)). The place of marriage rule provides stability in existing marriages. As the Arkansas Supreme Court held in *State v. Graves*, 228 Ark.  378 (1957), "[t]o hold otherwise would be to render void numberless marriages and to make illegitimate thousands of children the country

---

[1] The only exceptions to this rule are marriages that violate a particularly strong public policy. However, the public policy exception is rarely applied. *See Etheridge v. Shaddock*, 288 Ark. 481, 706 S.W.2d 395 (1986)(recognizing marriage between first cousins); *State v. Graves*, 228 Ark. 378, 307 S.W.2d 545 (1957)(recognizing marriage between thirteen (13) year old girl and seventeen (17) year old boy who legally wed in another state); *Osburn v. Graves*, 213 Ark. 727 (1948)(recognizing common law marriage).

over." *Id.* at 386.

Despite Arkansas's rich tradition of protecting marriages and individual privacy, Arkansas has adopted several statutes and a constitutional amendment aimed at preventing one specific class of persons—same-sex couples—from enjoying the fundamental rights and equal protection guaranteed by the Constitution. In 1997, the Arkansas Legislature amended the Arkansas statutes to specifically prohibit same-sex marriages and refuse recognition to same-sex marriages performed in other states. The State of Arkansas took even more drastic measures in 2004 when it amended the Arkansas Constitution with Amendment 83 to constitutionally prohibit same-sex marriages and to expressly forbid recognition of same-sex marriages legally entered into in other states. Although statutes already prohibited same-sex marriage in Arkansas, "backers of Amendment [83] said they wanted extra assurances that gay couples can't wed in Arkansas." Austin Gelder, Ark. Democrat-Gazette, *Arkansans Vote to Ban Gay Marriage*, Nov. 3, 2004.

As the Supreme Court recently held in *Windsor*, such laws cannot stand where they are intended to "harm a politically unpopular group." *Windsor*, 133 S. Ct. at 2693. Arkansas's marriage laws are not designed to protect or further any compelling or even legitimate government interest. All stated rationales for these laws have already been rejected by the Supreme Court in *Windsor* and prior Supreme Court cases. *See id.*; *Lawrence v. Texas*, 539 U.S. 558, 577–78 (2003)("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting [such practice] from constitutional attack.") These laws only injure

same-sex couples by denying them social "recognition, dignity, and protection" that marriage provides. *See id.* Such laws "place[] same-sex couples in an unstable position of being in a second tier marriage." *Id.* This Court should not allow such laws to stand any longer.

## II.   Legal Standard

A motion to dismiss filed pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). Rule 8 of the Federal Rules of Civil Procedure requires only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." In considering a motion to dismiss, the Court must accept all facts as true, but should disregard any legal conclusions. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). The Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). In making this determination, courts must view the facts in the light most favorable to the plaintiff and must accept any reasonable inference that may be drawn from plaintiff's allegations as true. *Cole v. Homier Distributing Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010). The complaint must contain enough factual matter, taken as true, to meet the required elements of the claims asserted. *Twombly*, 550 U.S. at 556. To survive a motion to dismiss under Rule 12(b)(6), the complaint must merely allege sufficient facts "to nudge the claims across the line from conceivable to plausible." *LasikPlus Murphy, M.D., P.A. v. LCA-Vision, Inc.*, 776 F. Supp. 2d 886, 896 (E.D. Ark. 2011)(citing *Twombly*, 550 U.S. at 570).

III.    **Amendment 83 and Arkansas's Marriage Laws Violate Plaintiffs' Constitutional Rights**

A.    *Due Process*

The Due Process Clause of the Fourteenth Amendment establishes that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "guarantees more than fair process . . . . "[I]t also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000)(internal citations and quotations omitted). "Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *Id.* at 116–17 (internal citations omitted). Arkansas's Marriage Ban and Anti-Recognition Laws violate these fundamental rights. As the Eastern District of Virginia stated, "[t]hese laws interject profound government interference into one of the most personal choices a person makes." *Bostic*, Case No. 2:13-cv-395, Doc. No. 136, at *22 (E.D. Va. Feb. 14, 2014).

1.    <u>**Fundamental Right to Marry**</u>

"The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men" and is thus "one of the 'basic civil rights of man'" protected by the Due Process Clause. *Loving*, 388 U.S. at 12 (quoting *Skinner*, 316 U.S. at 541). The right to marry is grounded in the substantive due process rights to privacy, autonomy, and freedom of intimate association. "Choices about marriage . . . are among associational rights [the Supreme] Court has ranked as

11

of basic importance to our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B.*, 519 U.S. at 116 (internal citation and punctuation omitted). Thus, "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).

Within this fundamental right to marry, the Due Process Clause also protects the fundamental liberty interests in marital relationships. "The right to marry is inseparable from our rights to privacy and intimate association." *Bostic*, Case No. 2:13-cv-395, Doc. No. 136, at *20 (E.D. Va. Feb. 14, 2014). For decades, the Supreme Court has held that spousal relationships are among those intimate family bonds whose "preservation" must be afforded "a substantial measure of sanctuary from unjustified interference by the State." *Roberts*, 468 U.S. at 618 ; *see also Griswold v. Connecticut,* 381 U.S. 479, 485–86 (1965)(marriage is "a relationship lying within the zone of privacy created by several fundamental constitutional guarantees"); *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)(recognizing "marital privacy" as a fundamental liberty interest). The Supreme Court in *Windsor* recently acknowledged "the equal dignity of same-sex marriages." *Windsor*, 133 S. Ct. 2693.

"Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights." *In re Marriage Cases*, 183 P.3d 384, 430 (Cal. 2002)(internal quotations omitted); *see Loving*, 388 U.S. 1 (holding that anti-miscegenation laws violated the fundamental right to marry

despite the long-standing tradition of excluding interracial couples from the institution of marriage). "Like all fundamental rights, the right to marry vests in every American citizen." *Kitchen*, 2013 WL 6697874, at *13 (citing *Zablocki*, 434 U.S. at 384). "Plaintiffs do not seek recognition of a new right." *Perry*, 704 F. Supp. 2d at 993. The right to marry is not limited to the right to marry a person of the opposite sex. As the District of Utah recently explained:

> The alleged right to same-sex marriage that the State claims the Plaintiffs are seeking is simply the same right that is currently enjoyed by heterosexual individuals: the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond. This right is deeply rooted in the nation's history and implicit in the concept of ordered liberty because it protects an individual's ability to make deeply personal choices about love and family free from government interference. And, as discussed above, this right is enjoyed by all individuals.

*Kitchen*, 2013 WL 6697874. In fact, Supreme Court cases addressing the "fundamental right to marry" do not recast the issue as "the right to interracial marriage," "the right to prisoner marriage," or "the right to marry persons owing child support." *See Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 982 n.5 (N.D. Cal. 2012)(citing *Loving*, 388 U.S. at 12, *Turner v. Safley*, 482 U.S. 78, 94–96 (1987), and *Zablocki*, 434 U.S. at 383–86). "The reality that marriage rights in states across the country have begun to be extended to more individuals fails to transform such a fundamental right into some 'new' creation." *Bostic*, Case No. 2:13-cv-395, Doc. No. 136, at *21 (E.D. Va. Feb. 14, 2014).

Any law that unduly burdens the fundamental right to marry must satisfy heightened scrutiny. *See Zablocki*, 434 U.S. at 383 ("Since our past decisions make clear that the right to marry is of fundamental importance, and since the classification at

issue here significantly interferes with the exercise of that right, we believe that "critical examination" of the state interests advanced in support of the classification is required."). "The [Due Process] Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests [including] the rights to marry; to have children; to direct the education and upbringing of one's children; [and] to marital privacy." *Glucksberg*, 521 U.S. at 720. The Marriage Ban and Anti-Recognition laws impose unconstitutional burdens on same-sex couples, both those wishing to be married in Arkansas and those married in other jurisdictions. Thus, these laws must withstand heightened scrutiny. *See Windsor*, 133 S. Ct. at 2693.

2.     **Right to Travel**

The "constitutional right to travel from one State to another is firmly embedded in [this country's] jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999). "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when," as here, "it uses any classification which serves to penalize the exercise of that right." *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903, 106 (1986)(internal quotation marks and citations omitted). Arkansas's Anti-Recognition Laws impermissibly burden Plaintiffs' right to travel because, while Arkansas generally recognizes valid out-of-state marriages, it categorically denies recognition of same-sex marriages performed in other states. If an opposite sex couple travels to an out-of-state location to marry, their marriage is recognized as valid in Arkansas when they return home. This is not the case with same-sex couples. The same-sex couple faces a categorical nullification of their marriage the moment they reenter the state. Plaintiffs are effectively treated as legal strangers in Arkansas despite

their valid out-of-state marriage. Thus, Plaintiffs face a severe penalty for exercising their right to travel. The State must present "a compelling state interest" for its denial of this fundamental right. *See Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 258 (1974).

**B.      *Equal Protection***

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of its laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause prohibits discrimination against members of protected classes of persons. Arkansas's Marriage Ban and Anti-Recognition Laws violate the Equal Protection Clause because these laws impermissibly treat same-sex couples differently on the basis of (1) sexual orientation and (2) sex. As such, these laws must meet the "careful consideration" test established in *Windsor*.

**1.      <u>Arkansas's Marriage Ban and Anti-Recognition Laws Must Meet the "Careful Consideration" Standard Established in Windsor</u>**

Arkansas's Marriage Ban and Anti-Recognition Laws violate Plaintiffs' right to equal protection under the Fourteenth Amendment. In *Windsor*, the Supreme Court held that DOMA, the federal law prohibiting federal recognition of same-sex marriages, "directs its restrictions and restraints [at] those persons who are joined in same-sex marriages." *Windsor*, 133 S. Ct. at 2695. A law targeting this class of persons warrants "careful consideration." *Id.* at 2692. In applying this "careful consideration," the Supreme Court concluded that DOMA's deviation from the traditional rule of recognizing valid marriages and its "avowed purpose" of ensuring that legally-married same-sex couples were denied the federal protections provided to all other married persons were "strong

evidence of a law having the purpose and effect of disapproval of that class." *Id.* at 2693. The Supreme Court struck down Section 3 of DOMA as unconstitutional, holding that "no legitimate purpose overcomes the purpose and effect to disparage and injure" same-sex couples by treating them differently than other married people. *Id.* at 2696.

Like DOMA, Arkansas's Marriage Ban and Anti-Recognition Laws have the "avowed purpose and practical effect" of denying same-sex couples the benefits and responsibilities otherwise afforded to valid out-of-state marriages in Arkansas. This purpose is apparent on the face of the laws themselves, which render "void" any marriage between members of the same sex. *See* Ark. Code § 9-11-208(a)(2); Ark. Code § 9-11-107. As with DOMA, denying equal treatment to same-sex couples is "the essence" of Arkansas's Marriage Ban and Anti-Recognition Laws, not "an incidental effect." *See Windsor*, 133 S. Ct. at 2693. Like DOMA, Arkansas's Marriage Ban and Anti-Recognition Laws were enacted "to ensure that if any State decides to recognize same-sex marriages, those unions will be treated as second-class marriages" in Arkansas. *Id.* at 2693–94. Thus, the "principal purpose is to impose inequality" and the "principal effect is to identify a subset of state-sanctioned marriage and make them unequal." *Id.* at 2694. "[N]o legitimate purpose overcomes the purpose and effect to disparage and injure" same-sex couples. *Id.* at 2696.

### 2.   Discrimination Based on Sexual Orientation

Arkansas's Marriage Ban and Anti-Recognition Laws must meet heightened scrutiny because sexual orientation is a suspect class under *Windsor*. Although sexual orientation was never before considered a suspect class, the Supreme Court in *Windsor* affirmed the Second Circuit's decision which expressly held that laws that discriminate

based on sexual orientation are subject to heightened scrutiny. *See Windsor*, 699 F.3d at 185; *see also*, *SmithKline Beecham Corp. v. Abbott Labs.*, 2014 WL 211807, at *9 (9th Cir. Jan. 21, 2014)(finding that *Windsor* employed heightened scrutiny). The Supreme Court provided further justification for treating sexual orientation as a suspect class as well, observing that gay, lesbian, and bisexual people have been subjected to a history of discrimination with regard to the protections, responsibilities, and benefits of marriage. *Id.* at 2689. The Court concluded that "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Id.* at 2693 (citations omitted).

### 3.   Discrimination Based on Sex

Arkansas's Marriage Ban and Anti-Recognition Laws also impermissibly discriminate against same-sex couples on the basis of their sex. For example, Becca and Tara Austin cannot marry in Arkansas, and Arkansas will not recognize Rita and Pam Jernigans' valid out-of-state marriage because they are all women. However, these marriages would be allowed and recognized if one of the partners were male. *See Perry v. Schwarzenegger,* 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010); *Baehr v. Lewin*, 852 P.2d 44, 64 (Haw. 1993)(Hawaii marriage statute regulates access to marriage "on the basis of the applicants' sex"); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 971 (Mass. 2003)(Greaney, J., concurring)(finding it "self-evident" that marriage ban is a "sex based" classification).

The Equal Protection Clause prohibits "differential treatment or denial of opportunity" based on a person's sex in the absence of an "exceedingly persuasive"

justification. *United States v. Virginia,* 518 U.S. 515, 532–33 (1996). Defendants cannot muster even a minimally plausible—let alone, an "exceedingly persuasive"—justification for employing these sex-based distinctions to deny same-sex couples the equal right to marry or to have their lawful marriages recognized in Arkansas. In fact, Defendants do not even address Plaintiffs' claim that Amendment 83 and the related statutes discriminate against Plaintiffs based on their sex.[2] In *Loving*, the Supreme Court rejected "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations." *Id.* at 8; *see also McLaughlin v. Florida*, 379 U.S. 184, 191 (1964)(equal protection analysis "does not end with a showing of equal application among the members of the class defined by the legislation"). Like in *Loving*, where the Court held that the different treatment rested "solely upon distinctions drawn according to race," the laws at issue here are based "solely upon distinctions drawn according to [sex]." *See Loving*, 388 U.S. at 11.

### C.   *Defendants Improperly Rely on Baker v. Nelson and Citizens for Equal Protection, Inc. v. Bruning*

Defendants almost exclusively rely on the unpersuasive authority in *Baker v. Nelson*, 409 U.S. 810 (1972) and *Citizens for Equal Protection, Inc. v. Bruning*, 455 F.3d 859 (8th Cir. 2006), in their arguments against the merits of Plaintiffs' claims. Each of these cases is inapplicable here as a result of the changing landscape in this area of the law, including the Supreme Court's holding in *Windsor*. The Supreme Court has cautioned that, "'when doctrinal developments indicate otherwise,'" the courts should not "'adhere to the view that if a Court has branded a question as unsubstantial, it

---

[2] Plaintiffs assume that Defendants' argument here would be like that of other defendants in similar cases—that these laws do not discriminate based on sex because the laws apply equally to both sexes.

remains so.'" *Hicks v. Miranda*, 422 U.S. 332, 355 (1975)(quoting *Port Auth. Bondholders Prot. Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 263 n. 3 (2d Cir. 1967)).

The Court should not blindly follow cases as controlling without looking to the Constitution itself and the changing jurisprudence in this area of the law. As the Court stated in *Lawrence*, 539 U.S. 558:

> [h]ad those who drew and ratified the . . . Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact only serve to oppress. As the Constitution endures, persons in every generation can invoke its principles in search of their own greater freedoms.

*Id.* at 178–79. As Justice Frankfurter stated over sixty (60) years ago in *Wolf v. Colorado*, 338 U.S. 25, "[i]t is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights." This Court should adhere to these principles in following the Supreme Court's guidance in *Windsor*, rather than blindly adhering to the outdated views set forth in *Baker* and *Bruning*.

## 1.    Defendants' reliance on *Baker v. Nelson* is misplaced

The Supreme Court's ruling in *Baker v. Nelson*, 409 U.S. 810 (1972), for want of federal jurisdiction is not dispositive here. In *Baker*, the Court summarily dismissed an appeal from the Supreme Court of Minnesota, *Baker v. Nelson*, 491 N.W.2d 185 (1971), holding that a state statute that defined marriage as between a man and woman did not violate any constitutional rights. As the Second Circuit noted in *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012),"[i]n the forty years after *Baker*, there have been

manifold changes to the Supreme Court's equal protection jurisprudence." *Id.* at 178–79; *see also Whitewood*, Case No. 2:24-cv-01861, at *5 (M.D. Pa. Nov. 15, 2013)("[t]he jurisprudence of equal protection and substantive due process has undergone what can only be characterized as a sea change since 1972."). In fact, "[w]hen *Baker* was decided in 1971, 'intermediate scrutiny' was not yet in the Court's vernacular[,] [c]lassifications based on illegitimacy and sex were not yet deemed quasi-suspect[, and] [t]he Court had not yet ruled that 'a classification of [homosexuals] undertaken for its own sake' actually lacked a rational basis." *Windsor*, 699 F.3d at 179. Other courts since *Windsor* have similarly disregarded *Baker* as uncontrolling. *See*, *e.g.*, *Bishop*, 2014 WL 116013.[3]

*Baker* could not and did not address how any of the "significant doctrinal developments," *Whitewood*, Case No. 2:24-cv-01861, at *6 (M.D. Pa. Nov. 15, 2013), bear on Plaintiffs' equal protection claims or how Plaintiffs' substantive due process claims should be evaluated in light of the court's intervening decisions in *Eisenstadt v. Baird*, 405 U.S. 438 (1972), *Roe v. Wade*, 410 U.S. 113 (1973), *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977), *Zablocki*, 434 U.S. 374; *Turner*, 482 U.S. 78, and *Lawrence*, 539 U.S. 558. None of the courts to address this issue since *Windsor* has found *Baker* controlling. "Although the Supreme Court's decision in *Windsor* was silent as to *Baker's* impact, statements made by the Justices indicate that lower courts should be applying *Windsor* (and not *Baker)* to the logical 'next issue' of state prohibitions of same-sex marriage. *Bishop*, 2014 WL 116013 (citing *Windsor,* 133 S.Ct. at 2696 (Roberts, C.J., dissenting)).

---

[3] *Baker* did not address whether anti-recognition laws violate equal protection, due process or the right to travel because no state allowed same-sex marriage in 1972.

### 2. *Bruning* is unpersuasive authority due to doctrinal changes in the area of same-sex marriage

Like *Baker*, Defendants also improperly rely on the Eight Circuit's decision in *Bruning*, 455 F.3d 859, for the proposition that Plaintiffs' equal protection claim must fail on the merits. In holding that sexual orientation is not a suspect class for equal protection purposes, the *Bruning* Court did not engage in any extensive discussion of the factors typically applied in equal protection cases. Instead, the Court cursorily concluded that the marriage ban must be valid simply because such laws have existed in the past and because only opposite-sex couples can biologically procreate. *Id.* at 867–68. As the court noted in *Bourke*, Case No. 3:13-cv-750, Doc. No. 47 (W.D. Ky. Feb. 12, 2014), "[t]his view was entirely consistent with the then-prevailing state and federal jurisprudence. A lot has changed since then." *Id.* at *2 (internal citations omitted). The Court's decision in *Windsor* requires a different result. At the very most, however, *Bruning* means only that the Court should apply rational basis review rather than some form of heightened scrutiny.

The Eighth Circuit's decision in *Bruning* is entirely inconsistent with *Windsor*. Notably, in 2006, the Eighth Circuit in *Bruning* stated that "to our knowledge no Justice of the Supreme Court has suggested that a state statute or constitutional provision codifying the traditional definition of marriage violates the Equal Protection Clause or any other provision of the United States Constitution." 455 F.3d at 870. This statement is no longer true in light of *Windsor*. "'[D]octrinal developments'" since *Windsor* require a different approach to these issues. *See Windsor*, 133 S. Ct. 2675; *Hicks*, 422 U.S. at 355. *Windsor* not only held that a federal statute codifying the "traditional definition of marriage" violates equal protection and due process guarantees, 133 S. Ct. at 2693, but

also indicated that state statutes and constitutional amendments must meet the same heightened constitutional scrutiny applied to the federal DOMA law. *See Windsor*, 133 S. Ct. at 2691, 2709 (Scalia J., dissenting). *Windsor* did not apply rational basis review. Instead, the *Windsor* Court applied a higher level of scrutiny—"careful consideration." *Windsor* and *Bruning* cannot be read in conjunction. The Court should apply *Windsor* rather than *Bruning.*

As Middle District of Pennsylvania stated in *Whitewood*, Case No. 1:13-cv-01861 (M.D. Pa. Nov. 15, 2013), "[t]he jurisprudence of equal protection and substantive due process has undergone what can only be characterized as a sea change since 1972. The Supreme Court has decided several cases . . . which demonstrate that it no longer views constitutional challenges based on sex and sexual identify classifications as unsubstantial." *Id.* at *5. As the *Bruning* Court itself stated, "[i]n areas of social and economic policy, a statutory classification *that neither proceeds along suspect lines nor infringes fundamental constitutional rights* must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational-basis for the classification." *Id.* at 867 (quoting *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993))(emphasis added). Thus, according to the Eighth Circuit's directive in *Bruning*, rational basis review is no longer sufficient in light of *Windsor* when such laws burden fundamental rights and impermissibly treat same-sex couples differently solely because of sex and sexual orientation.

## IV.    The Anti-Recognition and Marriage Ban and Anti-Recognition Laws are Unconstitutional Under Any Level of Constitutional Scrutiny

Arkansas's refusal to allow same-sex couples to marry and its categorical denial

of recognition to the valid out-of-state marriages of same-sex couples serve no legitimate government purpose. Facially, the purpose and effect of these laws is to "impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages." *Windsor* 133 S. Ct. at 2639. In *Windsor*, the Court reaffirmed that a bare legislative desire to harm a politically unpopular group of people can never justify disparate treatment of that group. *Id.* at 2693 (citing *U. S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973)). Arkansas's interest in treating same-sex married couples differently from opposite-sex married couples is the same improper purpose that the Supreme Court rejected in *Windsor*: "to impose inequality." *Id.* at 2694; *see also Romer,* 517 U.S. 635–36 (striking down state constitutional amendment that classified gay people "not to further a proper legislative end but to make them unequal to everyone else."). Arkansas has offered no sufficient basis for these laws. In fact, all possible justifications have been rejected by other courts considering this issue. *See*, *e.g*, *Bourke*, Case No. 3:13-cv-750, Doc. No. 47, at *15–16 (W.D. Ky. Feb. 12, 2014).

Like DOMA, Arkansas's laws violate Plaintiffs' state and federal rights to due process and equal protection because the State has no legitimate interest in treating the marriages of same-sex couples as inferior to or less respected than the marriages of opposite-sex couples, or in denying marriage (and all its attendant protections, benefits, and responsibilities) to same-sex couples and to their children. The purpose and effect of the challenged Arkansas provisions are to single out an unpopular group and treat them unequally. Such laws cannot survive under any level of constitutional scrutiny, even the very forgiving rational basis standard.

**A.      Arkansas's Marriage Ban and Anti-Recognition Laws Create Substantial Harm to Plaintiffs**

Marriage provides the only means under Arkansas law whereby two adults can establish a family unit that must be legally respected by the state and by others. *See*, *e.g.*, *Lutak v. U.S.*, 344, 611 (1953)(recognizing the "common understanding" of marriage as the means whereby "the two parties . . . have undertaken to establish a life together and assume certain duties and obligations to each other"). Through hundreds of statutes, regulations, and common law rules, Arkansas's laws provide married couples with comprehensive protections and responsibilities that enable them to make legally binding commitments to one another and to any children they may have, and to be treated as legal families. Arkansas's Marriage Ban and Anti-Recognition Laws injure Plaintiffs and their families by stripping them of the legal and social "recognition, dignity, and protection" that marriage provides. *See Windsor*, 133 S. Ct. at 2693. Marriage is more than the sum of the concrete legal rights and obligations it provides. Marriage is also recognized as a highly protected and respected family status of "immense import." *Id.* Marriage conveys the depth and seriousness of a couple's commitment to one another, and instructs others to respect the couple's privacy, dignity, and autonomy and the integrity of their family relationship.

The Marriage Ban burdens Plaintiffs' fundamental right to marry by denying them the ability to marry their chosen partner. This exclusion from marriage denies Plaintiffs and their families countless tangible and intangible benefits, stigmatizes and demeans their family relationships, and encourages and facilitates public and private discrimination against their families. *See Windsor*, 133 S. Ct. at 2689 (marriage permits couples "to define themselves by their commitment to each other" and "so live with pride

in themselves and their union and in a status of equality with all other married persons."). In addition to these harms, Arkansas's Anti-Recognition Laws cause serious harms to families and society by disregarding the longstanding, deeply rooted, and otherwise near-universal rule that a marriage that is validly entered into by a couple living in one state will be recognized when the couple travels or relocates to another state. This uniform rule of marriage recognition "confirms the parties' expectations, it provides stability in an area where stability (because of children and property) is very important, and it avoids the potentially hideous problems that would arise if the legality of a marriage varied from state to state." William M. Richman & William L. Reynolds, *Understanding Conflict of Laws* 398 (3d ed. 2002).

Plaintiffs have suffered specific harms through the actions of DFA and ATRS, including financial detriment as a result DFA's refusal to allow same-sex couples to file joint tax returns and ATRS's refusal to provide spousal benefits to same-sex partners. Numerous similarly situated same-sex couples in the state are also deprived of the benefits that DFA and ATRS provide to opposite-sex couples. This continued discrimination furthers no legitimate public interest. As stated in *Windsor*, such laws a legitimate purpose and target a certain class of people for unlawful discrimination based on sexual preference. *See Windsor*, 133 S. Ct. at 2693.

### B.   *Arkansas's Marriage Ban and Anti-Recognition Laws Cannot Even Meet the Lower Standard of Rational Basis Review*

The Court need not really decide which level of scrutiny applies here, however, because the Marriage Ban and Anti-Recognition Laws cannot survive even rational basis review. Under rational basis review, the State's asserted interest must be "legitimate," or "properly cognizable." *Cleburne*, 473 U.S. at 448. However, rational

basis review is not "toothless." *Matthews v. De Castro*, 429 U.S. 181, 185 (1976). An asserted justification must "find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993). Additionally, the State must demonstrate a rational relationship "between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633.

Every court that has considered this issue since *Windsor* has concluded that Marriage Ban and Anti-Recognition Laws similar to those at issue here cannot survive any level of constitutional scrutiny, including rational basis review. *See Bostic*, Case No. 2:13-cv-395, Doc. No. 139 (E.D. Va. Feb. 14, 2014); *Bourke*, Case No. 3:13-cv-750, Doc. No. 47 (W.D. Ky. Feb. 12, 2014); *Bishop*, 2014 WL 116013 (N.D. Okla. Jan. 14, 2014); *Obergefell v. Wymyslo*, 2013 WL 6726688; *Kitchen*, 2013 WL 6697874; *Gray*, 2013 WL 6355918; *Whitewood*, 1:13-CV-01861-JEJ (M.D. Pa. Nov. 15, 2013); *Kasich,* 2013 WL 3814262; *Bassett*, 2013 WL 3285111. As the District of Utah recently stated, "[t]he Supreme Court's decision in *Lawrence* removed the only ground—moral disapproval—on which the State could have at one time relied to distinguish the rights of gay and lesbian individuals from the rights of heterosexual individuals." *Kitchen*, 2013 WL 6697874. Defendants cannot satisfy rational basis review by merely stating that Amendment 83 and the referenced statutes meet rational basis review. Although Defendants do not actually state any rationales for the Marriage Ban or the Anti-Recognition Laws, Plaintiffs briefly respond to some of the rationales mentioned in

Defendants' brief and those addressed by other courts.

### 1. Protecting the "Traditional" Notion of Marriage is not a Rational Basis for the Marriage Ban or Anti-Recognition Laws

The Anti-Recognition Laws and Marriage Ban do not continue any existing tradition other than discrimination against same-sex couples. Rather, they mark an abrupt and unprecedented departure from one of the most deeply rooted aspects of Arkansas family law. Simply asserting a bare desire to maintain the status quo does nothing but circle back to and perpetuate the challenged classification without justification. The primary rationale stated when the statutory prohibitions were enacted in 1997 was "to protect, preserve and enhance the traditional family structure." S. 5 Am. 2, 81st Gen. Assembly (1997). In 2004, when Amendment 83 was placed on the ballot, one of the sponsors of the amendment wrote that "marriage has always meant the socially approved and encouraged sex bond between the male and the female, with the encouragement and expectation of bearing and rearing children and being caretakers of one another." John C. Thomas, Ark. Democrat-Gazette, *Why We Need Amendment 3*, Oct. 22, 2004.

Every court to consider this rationale—protecting traditional marriage—has found that this is not a rational basis for such discriminatory laws. As the Supreme Court cautioned in *Romer*, discriminatory classifications must serve some "independent and legitimate legislative end." 517 U.S. at 633. "[C]ourts reviewing marriage regulations, by *either* the state or federal government, must be wary of whether 'defending' traditional marriage is a guise for impermissible discrimination against same-sex couples." *Bishop*, 2014 WL 116013. Thus, "although [the law at issue] rationally promotes the State's interest in upholding one particular moral definition of marriage, this is not a permissible

27

justification," because "the majority view in Oklahoma must give way to individual constitutional rights." *Id.* "That [such] laws are rooted in tradition . . . cannot alone justify their infringement on individual liberties." *Bourke*, Case No. 3:13-00750, Doc. No. 47 at *14 (W.D. Ky. Feb. 12, 2014). Justice Scalia wrote in his dissent in *Lawrence* that "'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples." *Lawrence*, 539 U.S. at 601.

## 2. Encouraging Procreation is Not a Rational Basis for the Marriage Ban or Anti-Recognition Laws

Defendants' brief hints that perhaps the rational basis they are asserting is that the Marriage Ban and Anti-Recognition Laws promote and encourage procreation. *See* Defs.' Br. at 25 (citing *Bruning*, 455 F.3d 859). No court has upheld this rationale under any level of scrutiny. *See*, *e.g.*, *Perry v. Brown*, 671 F.3d 1052, 1088 (9th Cir. 2012)("There is no rational reason to think that taking away the designation of 'marriage' from same-sex couples would advance the goal of encouraging California's opposite-sex couples to procreate more responsibly.") This rationale "is 'so far removed' from the classification, [that] it is impossible to credit" and relies on "factual assumptions that are beyond the 'limits of rational speculation.'" *Windsor v. United States*, 833 F. Supp. 2d 394 (S.D.N.Y. 2012)(quoting *Romer*, 517 U.S. at 635; *Heller*, 509 U.S at 320).

Procreation has never been a prerequisite to marriage. In fact, the Supreme Court has long held that married couples have a right to *not* procreate. *Griswold*, 381 U.S. at 485–86. The Constitution protects the right of individuals to marry regardless of their ability or desire to procreate, including those who are elderly, infertile, and incarcerated. *See Lawrence*, 539 U.S. at 604 (Scalia, J., dissenting)("[W]hat justification could there possibly be for denying the benefits of marriage to homosexual couples

28

exercising '[t]he liberty protected by the Constitution'? Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.")(internal citation omitted)). Even prisoners with no right to conjugal visits have the fundamental right to marry because "many important attributes of marriage remain . . . [including] expressions of emotional support[,] exercise of religious faith[, and] an expression of personal dedication." *Turner*, 482 U.S. at 95 . Furthermore, the Supreme Court has held that the states cannot discriminate against children born out of wedlock, thus finding it unconstitutional to penalize parents who chose *not* to marry. *Cf. Levy v. Louisiana*, 381 U.S. 68 (1968). The Anti-Recognition Laws and Marriage Ban classify based on the sex and sexual orientation of those who want to marry, not whether they can procreate.

Same-sex couples routinely have children through assisted reproduction and adoption and are just as capable of raising children as opposite-sex couples. *Gill v. Office of Personnel Mgmt.*, 699 F. Supp. 2d 374, 388 (D. Mass. 2010)("[C]hildren raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents."). The government has just as strong an interest in ensuring that children of same-sex couples are raised in the stable context of a validly-recognized marriage as it does for the children of opposite-sex couples. "[A] stable two-parent family relationship, supported by the state's official recognition and protection, is equally as important for the numerous children . . . who are being raised by same-sex couples as for those children being raised by opposite-sex couples (whether they are biological parents or adoptive parents.)" *In re Marriage Cases*, 183 P.3d at 433. Arkansas is actively denying those children the very benefits of marriage by preventing same-sex couples from marrying or having their marriages recognized in Arkansas.

**3.    The Mere Fact that the People of Arkansas Adopted Amendment 83 by Ballot Measure Does Not Immunize Amendment 83 from Constitutional Scrutiny**

Defendants also improperly argue that the law passes rational basis review because Amendment 83 was adopted by popular vote by the citizens of Arkansas. *See* Defs.' Br. at 26 ("there is no fundamental right to be free of the political barrier a validly enacted constitutional amendment erects." *Bruning*, 455 F.3d at 868). This is simply not the case. The Western District of Kentucky recently rejected a similar argument, noting that "the Constitution, including its equal protection and due process clauses, protects us from all government action at any level, whether in the form of an act by a high official, a state employee, a legislature, or a vote of the people adopting a constitutional amendment." *Bourke*, Case No. 3:13-cv-00750, Doc. No. 47 at *21 (W.D. Ky. Feb. 12, 2014). As the *Bourke* court further explained, "'[i]t is emphatically the province and duty of the judicial system to say what the law is.' *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Initially that decision rests with one judge; ultimately, other judges, including the justices of the Supreme Court, have the final say. That is the way of our Constitution." *Id.* "Regardless of the justifications provided by an enactment's proponents, the Supreme Court has clearly stated that if such an enactment violates the U.S. Constitution—whether passed by the people or their representatives—judicial intervention is necessary to preserve the rule of law." *Obergefell*, 2013 WL 726688. "One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other *fundamental rights may not be submitted to vote; they depend on the outcome of no elections*." *Id.* (emphasis in original).

This Court should follow *Windsor* and its progeny and find that the State of

Arkansas has not provided a rational basis sufficient to uphold the discriminatory Marriage Ban or Anti-Recognition Laws.

## V.   Abstention is Improper

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given to them." *Col. River Conservation Dist. v. United States*, 424 U.S. 800 (1976). "'Generally, a federal district court must exercise its jurisdiction over a claim unless there are exceptional circumstances for not doing so.'" *Lexington Ins. Co. v. Integrity Land Title Co., Inc.*, 721 F.3d 958, 967 (8th Cir. 2013)(quoting *Scottsdale Ins. Co. v. Detco Indus., Inc.*, 426 F.3d 994, 996 (8th Cir. 2005)). "Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013)(citing *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373 (1989)("*NOPSI*")). The Supreme Court has set out only three (3) very limited categories of cases in which the Court should abstain because of a parallel state court action. *See NOPSI*, 491 U.S. at 367–68. None of these circumstances is present here.

Defendants incorrectly argue that the Court should abstain under the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971). The *Younger* abstention doctrine, which originally applied only to criminal cases, is very limited. The Supreme Court recently clarified that "[c]ircumstances fitting within the *Younger* doctrine, we have stressed, are 'exceptional'; they include, as catalogued in *NOPSI*, 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint*, 134 S. Ct. at 588 (quoting *NOPSI*, 491 U.S. at 367–68). The Court

concluded that "[w]e have not applied *Younger* outside these three 'exceptional' categories, and today hold . . . that they define *Younger's* scope." *Id.* at 591.

Defendants' argument misstates and misapplies the *Younger* abstention doctrine and seeks to impermissibly expand *Younger* into a broad doctrine that would permit abstention in virtually any case where a parallel state court proceeding is pending. Specifically, Defendants argue that "the *Younger* doctrine was later expanded to include abstention where parallel state court civil proceedings involving important state interests are pending." Defs. Br. at 7. (citing *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)). Thus, Defendants argue, "'federal courts should abstain from exercising their jurisdiction if (1) there is an ongoing state proceeding, (2) that implicates important state interests, and (3) that provides an adequate opportunity to raise any relevant federal questions.'" Defs. Br. at 7 (quoting *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1249 (8th Cir. 2011)(citing *Plouffe v. Ligon*, 606 F.3d 890, 894–95 (8th Cir. 2010)).

Abstention is inappropriate because this case does not fall within any of the three (3) established categories to which *Younger* applies. Clearly this case does not fit within the first category, criminal proceedings, or the third category, civil proceedings to enforce the court's orders. Finally, this case does not fit within the second category— civil enforcement proceedings—which are typically "quasi-criminal" in nature. *See Sprint*, 134 S. Ct. at 592–93. "[D]ecisions applying *Younger* to instances of civil enforcement have generally concerned state proceedings 'akin to criminal prosecutions' in 'important respects.'" *Id.* at 592. "Such enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for

some wrongful act." *Id.* This case does not fall within this "exceptional" category.

Rather than address the "exceptional circumstances" requirement, Defendants attempt to skip over this step and move on to applying the three (3) factor test set out in *Middlesex*, 457 U.S. 423. This is not the proper analysis. The Supreme Court in *Sprint*, 134 S. Ct. at 593–94, recently rejected this same argument and analysis as an improper extension of the *Younger* doctrine. The Court in *Middlesex*, 457 U.S. 423, set out three (3) factors that the Court should consider in determining whether to abstain in cases involving civil enforcement proceedings: (1) an ongoing state judicial proceeding; (2) the proceeding implicates important state interests; and (3) the state court proceeding presents an adequate opportunity to raise constitutional challenges. *Id.* at 432. The Court considers the *Middlesex* factors only *after* determining that the case falls within the second "exceptional circumstances" category—a "quasi-criminal" civil enforcement proceeding. Thus, as the *Sprint* Court emphasized, these factors are "*additional* factors appropriately considered by the federal court before invoking *Younger*." *Sprint*, 134 S. Ct. at 593 (emphasis added). "Divorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Id.* at 593. "That result is irreconcilable with [the Court's] dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.* (quoting *Haw. Housing Auth. v. Midkiff*, 467 229, 236 (1984); *Col. River*, 424 U.S. at 813 ).

This Court should not abstain under the *Younger* abstention doctrine as this case does not fall within any of the three (3) established categories of "exceptional

circumstances" sufficient to justify such action. Because none of the three (3) exceptional circumstances is present, "the general rule governs: '[T]he pendency of an action in [a] state court is no bar to proceedings concerning the same subject matter in the Federal court having jurisdiction.'" *Id.* (quoting *Col. River*, 424 U.S. at 817)(modifications in original). Finally, abstention is especially inappropriate here because the federal court should not abstain "where a state statute is 'flagrantly and patently violative of express constitutional prohibitions.'" *Plouffe*, 606 F.3d at 893 (quoting *Trainor v. Hernandez*, 431 U.S. 434, 447 (1997)). As explained above, Amendment 83 and the challenged statutes constitute a flagrant violation of Plaintiffs' constitutional rights to due process and equal protection.

## V.   The State Defendants are Proper Defendants

Defendants incorrectly argue that they are not proper defendants to this suit and that state officials may not be enjoined from enforcing state laws. Although the Eleventh Amendment affords sovereign immunity to states, providing that they may not be sued in law or in equity by citizens of their own state or citizens of other states, this doctrine is not absolute. Specifically, a state's sovereign immunity "does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute [where] such officer [has] some connection with the enforcement of the act." *Mo. Prot. and Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007); *see also*, *Pennoyer v. McConnaughy*, 140 U.S. 1, 11 (1891)("the exemption of the state from suability could not be pleaded by its officers when they were proceeded against for executing an unconstitutional act of the state"); *Osborn v. Bank of United States*, 22 U.S. 738 (1824)("[i]t was proper, then, to make a decree against the defendants in the Circuit

Court, if the law of the State of Ohio be repugnant to the constitution, or to a law of the United States made in pursuance thereof.").

The Eighth Circuit Court of Appeals rejected an argument similar to that presented by Defendants here in *Missouri Protection*, 499 F.3d at 805. In doing so, the court found that the Attorney General satisfied the "some connection with the enforcement of the act" requirement and was a proper party to the case because of his statutorily granted authority to represent the state in both criminal and civil cases. *Id.* Like in *Missouri Protection*, Defendants are all proper parties because all three (3) state Defendants have "some connection with the enforcement" of the alleged unconstitutional laws. Attorney General McDaniel's authority is created by statute, *see* Ark. Code Ann. § 25-16-703, and he is the "legal representative of all state officers, boards, and commissioners in all litigation where the interests of the state are involved." *See Mo. Prot.*, 499 F.3d at 805. Defendants Weiss and Hopkins are responsible for tax collection and the administration of state-sponsored retirement plans, both of which are well-recognized attributes of the institution of marriage. While Heterosexual married couples can file joint tax returns that are received by the Arkansas Department of Finance and Administration and enjoy the benefits of their partners' retirement benefits, Defendants' enforcement of the Marriage Ban and Anti-Recognition Laws prohibit Plaintiffs from receiving these benefits which are central to the marriage relationship.

Defendants' reliance on *Pennsylvania v. Williams*, 294 U.S. 176 (1935), is misplaced. *Williams* involved a suit against a state-created corporation, not a state official acting in his official capacity. *See id.* at 185 ("[i]t has long been accepted practice for the federal courts to relinquish their jurisdiction in favor of this state courts, where its

exercise would involve control of or interference with the internal affairs of a domestic *corporation* of the state.")(emphasis added). *Williams* also states the court should not interfere with "lawful action of state officers." *Id. Williams* thus has no relevance to the case at hand, where Defendants' unlawful actions deprive Plaintiffs of constitutionally protected rights. The Court should reject Defendants' arguments to the contrary.

## VI.    Conclusion

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

**Dated: February 14, 2014**                    Respectfully submitted,

WAGONER LAW FIRM, P.A.

By:     /s/ Jack Wagoner
Jack Wagoner III, A.B.A. # 89096
R. Keith Pike, A.B.A. # 2010123
Angela Mann, A.B.A. # 2011225
Sarah Cowan, A.B.A. #2013182
Wagoner Law Firm, P.A.
1320 Brookwood, Suites D & E
Little Rock, AR 72202
Phone: (501) 663-5225
Fax: (501) 660-4030
Email: jack@wagonerlawfirm.com
Email: keith@wagonerlawfirm.com
Email: angela@wagonerlawfirm.com
Email: sarah@wagonerlawfirm.com

**CERTIFICATE OF SERVICE**

I, Jack Wagoner, do hereby certify that a true and correct copy of the foregoing document was served electronically by means of the Court's ECF/CM system on the following attorney of record:

David M. Fuqua
dfuqua@fc-lawyers.com

Nga Mahfouz
nga.mahfouz@arkansasag.gov

/s/ Jack Wagoner
Jack Wagoner