**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**RITA and PAM JERNIGAN and
BECCA and TARA AUSTIN**                                             **PLAINTIFFS**

**v.**                               **Case No. 4:13-cv-00410 KGB**

**LARRY CRANE, in his official capacity as
Circuit and County Clerk for Pulaski County,
Arkansas, and his successors in interest;
DUSTIN MCDANIEL, in his official capacity
as Attorney General for the State of Arkansas,
and his successors in interest; RICHARD
WEISS, in his official capacity as Director of
the Arkansas Department of Finance and
Administration, and his successors in interest;
and GEORGE HOPKINS, in his official
capacity as Executive Director of the Arkansas
Teacher Retirement System, and his
successors in interest**                                             **DEFENDANTS**

## OPINION AND ORDER

Plaintiffs Rita and Pam Jernigan and Becca and Tara Austin challenge Arkansas's laws defining marriage as between a man and woman. Specifically, plaintiffs challenge the constitutionality of Amendment 83 to the Arkansas Constitution and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208.

Pending before the Court are several motions. Separate defendants Dustin McDaniel, Richard Weiss, and George Hopkins, in their official capacities ("Separate Defendants"), have filed a motion to dismiss (Dkt. No. 17). Plaintiffs have responded in opposition to the motion to dismiss (Dkt. No. 23) and have filed a motion for summary judgment (Dkt. No 24), to which

Separate Defendants have responded in opposition (Dkt. No. 27).[1]  The Court held a hearing on all pending motions November 20, 2014.

Plaintiffs are two lesbian couples; the partners of each couple have been in an exclusive, committed relationship with one another for years.  Plaintiffs here claim to seek the same rights as opposite-sex couples:  the freedom to marry their chosen partners, the recognition of their marriages performed in other states that make same sex marriage lawful, and the right to receive the state benefits attendant to marriage.  Through their claims, plaintiffs challenge the constitutionality of Arkansas's laws excluding same-sex couples from marriage and forbidding recognition of legitimate same-sex marriages entered into in other states.  *See* Ark. Const. amend. 83; Ark. Code Ann. §§ 9-11-107, -109, -208.  Plaintiffs challenge these laws claiming they violate the federal constitution.  This Court has jurisdiction; among other statutes, 28 U.S.C. § 1331 confers jurisdiction on federal courts to decide questions arising under the Constitution of the United States.  For the reasons set forth below, the Court grants in part and denies in part Separate Defendants' motion to dismiss (Dkt. No. 17) and plaintiffs' motion for summary judgment (Dkt. No. 24).

## I.    Background

Amendment 83 to the Arkansas Constitution defines marriage as "consist[ing] only of the union of one man and one woman."  Current Arkansas law defines marriage as "between a man and a woman" and declares that all marriages of same-sex couples are void.  Ark. Code Ann. § 9-11-109.  Current Arkansas law also provides for recognition of marriages from other states or

---

[1]  Separate defendant Larry Crane filed a motion to dismiss on the ground of comity (Dkt. No. 7) prior to plaintiffs' filing their amended complaint (Dkt. No. 16).  Because Mr. Crane did not renew his motion to dismiss after plaintiffs filed their amended complaint, the Court denies Mr. Crane's motion as moot.  The Court notes that Mr. Crane's motion presented abstention issues that overlap with abstention issues asserted by Separate Defendants.

countries but specifically excludes marriages by persons of the same sex.  *Id.* § 9-11-107.  In addition, Arkansas law now provides that the State only recognizes the marital union of "man and woman," forbids clerks from issuing marriage licenses to same-sex couples, forbids the recognition of lawful same-sex marriages entered into in other states, and holds unenforceable any contractual or other rights granted by a same-sex marriage of another state.  *Id.* § 9-11-208.

Plaintiffs Rita and Pam Jernigan ("the Jernigans") state that they are a lesbian couple who have been in a committed relationship for five years and are married under Iowa state law.  The Jernigans claim that Rita retired after teaching math in the Little Rock School District for more than 28 years; that she participated in the Arkansas Teacher Retirement System ("ATRS") while employed and currently receives retirement pay from the ATRS; that Amendment 83 prohibits Pam from being considered as Rita's spouse for purposes of her teacher retirement; and that Amendment 83 prohibits Pam from receiving surviving spouse benefits under the ATRS in the event of Rita's death.

Plaintiffs Becca and Tara Austin ("the Austins") state that they are a lesbian couple who have been in a committed relationship for over nine years and wish to marry for the same reasons that many other couples marry:  to declare publicly their love and commitment to one another before their family, friends, and community and to give to one another the security and protections that only marriage provides.  The Austins state that they are both employees of the University of Arkansas for Medical Sciences and that they have twins—a boy and a girl—who are now five years old.  The Austins maintain that Tara is the biological mother of the twins and that, because Becca is not a biological parent to the children and cannot legally marry Tara under Arkansas law, Arkansas law does not consider Becca a parent to the twins.  The Austins further state that their inability to marry legally in Arkansas reduces their family resources and

stigmatizes the Austins and their children by denying the family social recognition and respect. The Austins claim that Becca was denied family leave to spend time with the twins at home because she and Tara were not married under Arkansas law and the children were not legally her dependents; that despite Tara's desire to stay home after the birth of the children, Tara had to return to work full-time to maintain health insurance for herself and the children; and that Becca could not carry Tara and the children on a family health insurance plan because she and Tara were not, and could not be, legally married under Arkansas law and the children were not her legal dependents.

Plaintiffs are all homeowners in and residents of Pulaski County, Arkansas, and involved in their communities.  Plaintiffs state that they have cared for each other, supported each other, sacrificed for each other, and made plans for the future with each other; that they have experienced hardship, illness, joy, and success during the course of their relationships; and that they are spouses in every sense, except that Arkansas law dictates that they cannot marry and that, even if they are legally married pursuant to the laws of another state, Arkansas will not legally recognize their marriage.

Plaintiffs all applied for and were denied marriage licenses with the Pulaski County Circuit and County Clerk after the Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013).  *Windsor* held as unconstitutional Section 3 of the federal Defense of Marriage Act ("DOMA"), wherein Congress defined marriage for purposes of all federal laws to include only the marriages of opposite-sex couples.  *See Windsor*, 133 S. Ct. at 2693.

The Jernigans state that because the state of Arkansas would not allow them to marry, they were forced to incur expense and inconvenience in traveling to Iowa to marry, which they did on December 16, 2013.  Arkansas will not recognize the Jernigans' marriage as legal.  Before

the Jernigans performed their marriage ceremony in Iowa, Rita approached the ATRS.  The ATRS told Rita that, even after she legally married Pam in Iowa, the ATRS still would not allow Rita to name Pam as her surviving spouse on her ATRS retirement plan.

Plaintiffs sue separate defendant Larry Crane in his official capacity as Circuit and County Clerk for Pulaski County, Arkansas.  The Jernigans and the Austins applied for marriage licenses on July 11, 2013, but Mr. Crane's office refused to issue them marriage licenses because Amendment 83 and Arkansas Code Annotated § 9-11-208 prohibit the Clerk from issuing a marriage license to persons of the same gender.

Plaintiffs sue separate defendant Dustin McDaniel in his official capacity as the Attorney General of the State of Arkansas.  Plaintiffs state that Attorney General McDaniel's duties include both enforcing the law and advising officials within the state about the requirements of the law, including Amendment 83 and the challenged statutes.  Arkansas law directs Attorney General McDaniel to "maintain and defend the interests of the State in matters before . . . federal courts" and to be the "legal representative of all state officers, boards, and commissioners in all litigation where the interests of the state are involved."  Ark. Code Ann. § 25-16-703.

Plaintiffs sue separate defendant Richard Weiss in his official capacity as Director of the Arkansas Department of Finance and Administration ("DFA").  Director Weiss is responsible for accepting or refusing tax returns filed by Arkansas residents and non-residents.  *Id.* § 25-8-102. Amendment 83 prohibits same-sex couples married in other states from filing joint Arkansas tax returns.

Plaintiffs sue separate defendant George Hopkins in his official capacity as Executive Director of the ATRS.  Plaintiffs state that Executive Director Hopkins is responsible for enforcing rules created by the ATRS Board of Trustees including withholding spousal benefits

from same-sex spouses who are legally married under the laws of jurisdictions that recognize same-sex marriage and preventing same-sex spouses from receiving retirement benefits from the ATRS in the event of recipients' deaths.  Plaintiffs seek a declaration that Amendment 83 and the referenced statutes violate their rights to equal protection and due process of law under the Fourteenth Amendment to the United States Constitution.  Plaintiffs Rita and Pam Jernigan seek preliminary and permanent injunctive relief requiring that defendants recognize their legitimate out-of-state marriage.  All plaintiffs seek permanent injunctive relief prohibiting the state of Arkansas and all political subdivisions thereof from enforcing Amendment 83 or the referenced statutes.

## II.     Motions To Dismiss For Reasons Other Than The Merits

The Court turns first to Separate Defendants' motion to dismiss (Dkt. No. 17) to which plaintiffs have responded (Dkt. No. 23).  Separate Defendants raise four arguments in support of their request that this Court dismiss plaintiffs' claims against some or all of the named defendants.  First, Separate Defendants contend that the claims against Director Weiss and Executive Director Hopkins should be dismissed under Federal Rule of Civil Procedure 12(b)(5) for inadequate service of process since, as of the date of the filing of the motion to dismiss, Director Weiss and Executive Director Hopkins had not been served with a copy of the summons and amended complaint.  Second, Separate Defendants also argue that the Court should dismiss this case pursuant to the *Younger v. Harris*, 401 U.S. 37 (1971), abstention doctrine.  The Court will address this doctrine raised by Separate Defendants, as well as additional abstention doctrines and the *Rooker-Feldman* doctrine raised on the Court's own motion.  Third, Separate Defendants claim that this Court lacks jurisdiction because the claims against Separate Defendants are barred by the Eleventh Amendment to the United States Constitution.  Fourth,

Separate Defendants move to dismiss plaintiffs' amended complaint with prejudice for failure to state a claim upon which relief may be granted; the Court will discuss this argument *infra* in section III.

### A.      Service Of The Amended Complaint

As for the procedural argument for dismissal advanced by Director Weiss and Executive Director Hopkins, Federal Rule of Civil Procedure 4(m) gives a plaintiff 120 days after the complaint is filed to serve a defendant.  This rule also applies to service of defendants who are added by an amended complaint.  *Carmona v. Ross*, 376 F.3d 829, 830 (8th Cir. 2004).  Plaintiffs filed their amended complaint on January 17, 2014, adding as defendants Director Weiss and Executive Director Hopkins.  Plaintiffs returned executed summonses as to Director Weiss and Executive Director Hopkins on February 7, 2014, indicating that plaintiffs served these two defendants on February 6, 2014 (Dkt. Nos. 20, 21, 22).  Therefore, plaintiffs properly served Director Weiss and Executive Director Hopkins within the 120 day period, and the Court denies Separate Defendants' motion to dismiss for inadequate service of process.

### B.      Motion To Dismiss Claims Pursuant To Abstention

Separate Defendants argue that this Court should abstain from exercising jurisdiction over this suit pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), because a substantially similar suit is pending in the Arkansas state court system.  Generally, the doctrine of abstention authorizes a federal court to decline to exercise jurisdiction if federal court adjudication would "cause undue interference with state proceedings."  *New Orleans Pub. Serv., Inc. v. Council of New Orleans ("NOPSI")*, 491 U.S. 350, 359 (1989).  Even in cases where permissible, however, abstention under any doctrine is "the exception, not the rule."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  Abstention "is an extraordinary

and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* (citations omitted). "[F]ederal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013).

This Court recognizes the import of what plaintiffs ask it to do in examining the federal constitutionality of Arkansas state laws. While "the Constitution and Congress equip federal courts with authority to void state laws that transgress federal civil rights, . . . comity toward state sovereignty counsels the power be sparingly used." *Moe v. Dinkins*, 635 F.2d 1045, 1046 (2d Cir. 1980). As a result, this Court will examine the *Younger* abstention doctrine raised by Separate Defendants and three additional abstention doctrines, as well as the *Rooker-Feldman* doctrine, raised on the Court's own motion to satisfy these concerns before the Court considers the merits of plaintiffs' claims.

Other courts that have examined abstention in the context of same sex marriage laws have opted not to abstain. Although not controlling, that authority is persuasive and informs this Court. *See, e.g.*, *Marie v. Moser, M.D.*, No. 14-cv-02518-DDC/TJJ, 2014 WL 5598128 (D. Kan. Nov. 4, 2014); *Wolf v. Walker*, 9 F. Supp. 3d 889 (W.D. Wis. 2014). The following five subsections address the propriety of abstention, and application of the *Rooker-Feldman* doctrine, and the Court's ultimate conclusion not to abstain here.

### 1.    *Younger* Abstention

Separate Defendants assert that a parallel action challenging the federal constitutionality of these same Arkansas laws was filed prior to the commencement of this action and is currently being litigated in Arkansas state court. *See M. Kendall Wright, et al. v. Nathaniel Smith, M.D., M.P.H., et al.*, Arkansas Supreme Court Case No. CV-14-427 ("*Wright*"). That case is on appeal from the Circuit Court of Pulaski County, Arkansas, Second Division, Case No. 60CV-13-2662.

Assuming without deciding that the issues raised in *Wright* might resolve the constitutional questions presented here, and because an injunction if issued by this Court could interfere with the legal issues in those state proceedings, the Court considers whether it should abstain from adjudicating this action under the principles of *Younger*, 401 U.S. 37, as Separate Defendants suggest.

Although the Supreme Court has repeatedly cautioned that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colorado River*, 424 U.S. at 817, the Supreme Court in *Younger* recognized a limited exception to that general rule. This abstention doctrine reflects the "longstanding public policy against federal court interference with state court proceedings." *Younger*, 401 U.S. at 43. The doctrine holds that, for reasons of state sovereignty and comity in state-federal relations, federal courts should not enjoin state judicial proceedings. *Younger* abstention is required when: (1) there is an ongoing state judicial proceeding involving the federal plaintiffs; (2) that implicates important state interests; and (3) the proceeding provides an adequate opportunity for the federal plaintiff to assert his or her federal claims. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

Originally, *Younger* abstention applied only to concurrent state court criminal proceedings. *Younger*, 401 U.S. at 53. The scope of the doctrine has expanded gradually. In its current form, the doctrine also prevents federal courts from interfering with state civil and administrative proceedings. *See generally Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) (determining that federal courts may not enjoin pending state court civil proceedings between private parties); *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619 (1986) (determining that federal courts may not enjoin pending state administrative proceedings

involving important state interests). Further, the restrictions derived from *Younger* against federal court injunctions include requests for declaratory relief because "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state court proceedings that [*Younger* abstention] was designed to avoid." *Samuels v. Mackell*, 401 U.S. 66, 72 (1971).

Even if *Wright* might resolve the issues presented here, the Court concludes that *Younger* abstention is not appropriate for two independent reasons. First, plaintiffs are not a party in *Wright* and therefore cannot assert their constitutional claims in that proceeding. Abstention is mandated under *Younger* only when the federal plaintiff is actually a party to the state proceeding; the *Younger* doctrine does not bar non-parties from raising constitutional claims in federal court, even if the same claims are being addressed in a concurrent state proceeding involving similarly situated parties. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928-29 (1975).

Second, even if plaintiffs had asserted their claims in *Wright*, the Supreme Court has narrowed the application of *Younger* to three "exceptional circumstances." The Supreme Court recently held that the *Younger* doctrine applies only to three classes of parallel proceedings: (1) "state criminal prosecutions"; (2) "particular state civil proceedings that are akin to criminal prosecutions"; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 134 S. Ct. at 588; *see id.* at 591 ("We have not applied *Younger* outside these three 'exceptional' categories, and today hold . . . that they define *Younger*'s scope."); *see id.* at 588 ("Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."). This Court finds that the instant case does not fall under any one of the three "exceptional" categories laid out in *Sprint*.

Because this case is not parallel to a state criminal prosecution or to a particular state civil proceeding akin to a criminal prosecution, this Court examines whether this case falls within the third exception—pending state court civil proceedings involving certain orders that uniquely further the Arkansas state courts' ability to perform their judicial functions. This argument is enticing, for this Court recognizes that a decision from an Arkansas state court would not raise the comity concerns inherent in a federal court injunction. However, after reviewing the cases where the Court has approved of abstention under this branch of the *Younger* analysis, the Court concludes that abstention is not appropriate here. *See generally NOPSI*, 491 U.S. at 367-68.

Specifically, in *Juidice v. Vail*, 430 U.S. 327, 335 (1977), the Supreme Court held that a federal court should abstain from interfering with a state's contempt process because it is integral to "the regular operation of [the state's] judicial system." Likewise, in *Penzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13-14 (1987), the Court extended *Juidice* to a challenge to Texas's law requiring an appellant to post a bond pending appeal. As the Court explained, both "involve[d] challenges to the processes by which the State compels compliance with the judgments of its courts." *Id.* Both involved processes the state courts used to decide cases and enforce judgments—functions that are uniquely judicial functions. In contrast, when an Arkansas county clerk issues a marriage license, the clerk is preforming a ministerial function. *See* Ark. Code Ann § 9-11-203 ("The clerks of the county courts of the several counties in this state are required to furnish the license upon: (1) Application's being made; (2) Being fully assured that applicants are lawfully entitled to the license; and (3) Receipt of his or her fee"); *see also* Ark. Op. Att'y Gen. No. 2013-121 (Oct. 7, 2013) ("Pursuant to A.C.A. § 9-11-203, 'county clerks' have the authority and obligation to issue marriage licenses.").

Accordingly, this Court determines the challenge presented by plaintiffs here does not qualify as one uniquely furthering the ability of Arkansas courts to perform their judicial functions in the sense that the post-*Younger* cases use that phrase. Therefore, this Court declines to apply *Younger* or to abstain from exercising its jurisdiction.

### 2. *Pullman* Abstention

Under the abstention doctrine of *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496 (1941), "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). The Court raises the question of *Pullman* abstention on its own motion. "*Pullman* abstention is limited to uncertain questions of state law." *Id.* (citing *Colorado River*, 424 U.S. at 813). If the meaning or method of enforcing a law is unsettled, federal courts should abstain so that a state court has an opportunity to interpret the law. *Id.* If the state court might construe the law in a way that obviates the need to decide a federal question, abstention prevents "both unnecessary adjudication and 'needless friction with state policies.'" *Id.* (quoting *Pullman*, 312 U.S. at 500). Conversely, "[w]here there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim. We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it." *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) (citations omitted); *see also Zwickler v. Koota*, 389 U.S. 241, 251 (1967) (determining that a federal court should not abstain under *Pullman* simply to give a state court the first opportunity to decide a federal constitutional claim).

No party argues, and the Court does not determine there to be, any ambiguity or uncertainty in the Arkansas laws plaintiffs challenge here.  The challenged laws are not subject to an interpretation that might avoid or modify the federal constitutional questions raised by plaintiffs.  The critical concern underlying application of *Pullman* abstention is missing— avoidance of unnecessary state-federal friction where deference to a state court decision may negate the federal question involved.  The Court will not apply *Pullman* to abstain.

### 3. *Colorado River* Abstention

The United States Supreme Court has recognized that, in certain circumstances, it may be appropriate for a federal court to refrain from exercising its jurisdiction to avoid duplicative litigation when there is a concurrent foreign or state court action.  *Colorado River*, 424 U.S. 800.  Although it is generally classified as an abstention doctrine, *Colorado River* is not truly an abstention doctrine because it "springs from the desire for judicial economy, rather than from constitutional concerns about federal-state comity."  *Rienhardt v. Kelly*, 164 F.3d 1296, 1303 (10th Cir. 1999).  However, "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention."  *Colorado River*, 424 U.S. at 818.  The Court raises on its own motion the issue of whether to abstain under *Colorado River*.

*Colorado River* identified four factors that federal courts should consider when deciding whether to abstain:   (1) the problems that occur when a state and federal court assume jurisdiction over the same res; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; and (4) the order that the concurrent forums obtained jurisdiction.  *Id.*  "No one factor is necessarily determinative," but "[o]nly the clearest of justifications will

warrant dismissals." *Id.* at 818-19.

The Court finds no clear justification for dismissing this case under *Colorado River*.  This Court has not assumed concurrent jurisdiction over the same res as any Arkansas state court.  Moreover, concerns about interfering with state proceedings are resolved under a *Younger* analysis, which the Court determines does not apply here.  Finally, this case and *Wright* are not parallel proceedings for purposes of *Colorado River* because the cases involve different parties and different claims.  This Court determines that *Colorado River* does not apply.

### 4.    *Burford* Abstention

This Court also raises on its own motion abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  In *Burford*, the federal court confronted a complex question of Texas oil and gas law governed by a complex state administrative scheme.  *Id.* at 318-20.  Holding that the federal district court should have dismissed the case, the Supreme Court emphasized the existence of complex state administrative procedures and the need for centralized decision making when allocating drilling rights.  *Id.* at 334.

The Court does not find Arkansas's system for administering the marriage laws to be so complex that state officials will struggle to sort out an injunction banning enforcement of the state's same-sex marriage ban.  This case also does not present the type of issue best left to localized administrative procedures.  Rather, this case presents federal constitutional questions, ones squarely within the province and competence of a federal court.  Accordingly, the Court declines to abstain under *Burford*.

### 5.    The *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine provides that federal courts, except for the Supreme Court, cannot directly review state court decisions.  In *Exxon Mobil Corporation v. Saudi Basic*

*Industries Corporation*, 544 U.S. 280 (2005), the Supreme Court confined the doctrine's application to the factual setting presented in the two cases that gave the doctrine its name:  when the losing parties in a state court case bring a federal suit alleging that the state court ruling was unconstitutional.  *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  The Court raises the *Rooker-Feldman* doctrine on its own motion.

As an initial matter, plaintiffs have not lost in Arkansas state court.  Instead, plaintiffs here challenge the constitutionality of certain Arkansas laws.  Such challenges are permissible under *Rooker-Feldman* because the doctrine does not bar a federal court from deciding the "validity of a rule promulgated in a non-judicial proceeding."  *Feldman*, 460 U.S. at 486.  Further, concurrent state and federal court litigation over similar issues does not trigger dismissal under *Rooker-Feldman*.  *See Exxon Mobil*, 544 U.S. at 292 ("[N]either *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or a related question").  Moreover, plaintiffs are not parties to *Wright* and "[t]he *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state court judgment."  *Lance v. Dennis*, 546 U.S. 459, 466 (2006).

After analyzing the four abstention doctrines, and the *Rooker-Feldman* doctrine, the Court finds that none of these doctrines support evading its "virtually unflagging obligation . . . to exercise [its] jurisdiction."  *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 15 (1983).

### C.    Motion To Dismiss Claims Pursuant To Eleventh Amendment

Separate Defendants next argue that they are not proper defendants in the present action because they are immune from suit under the Eleventh Amendment of the United States

Constitution. However, a state official may be sued to enjoin enforcement of an allegedly unconstitutional state statute when "such officer [has] some connection with the enforcement of the Act." *Ex parte Young*, 209 U.S. 123, 157 (1908); *see also Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (holding that a "state's Eleventh Amendment immunity does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that such officer has some connection with the enforcement of the act." (quotations omitted)). Separate Defendants cite non-controlling case law from other jurisdictions to support the proposition that they do not have sufficient connection with the enforcement of the laws and actions about which plaintiffs complain. However, the Eighth Circuit Court of Appeals rejected a similar argument in *Missouri Protection and Advocacy Services, Inc*. In doing so, the Eighth Circuit Court of Appeals found that the Missouri Secretary of State and Attorney General satisfied the "some connection with the enforcement of the act" requirement and therefore were proper parties to the case. *Mo. Prot. & Advocacy Servs., Inc.*, 499 F.3d at 807. Specifically, the Court determined that, because of his statutorily granted authority to represent the state in both criminal and civil cases, the Missouri Attorney General was properly named as a defendant and that the *Ex parte Young* exception to Eleventh Amendment immunity applied. *Id*.

This Court agrees with plaintiffs that all three Separate Defendants satisfy this requirement. Attorney General McDaniel's authority is created by statute, *see* Ark. Code Ann. § 25-16-703, and he is the legal representative of all state officers, boards, and commissioners in all litigation where the interests of the state are involved. *See Mo. Prot. & Advocacy Servs., Inc.*, 499 F.3d at 807. Director Weiss's authority is created by statute, *see* Ark. Code Ann. § 25-8-101, and he is responsible for accepting or refusing tax returns, including enforcing Amendment

83 by refusing joint Arkansas tax returns filed by same-sex spouses who were married in other states. Executive Director Hopkins's authority is created by statute, *see id.* § 24-7-303(c), and he is responsible for enforcing rules created by the ATRS Board of Trustees including (1) withholding spousal benefits from same-sex spouses who are legally married under the laws of jurisdictions that recognize same-sex marriage and (2) preventing same-sex spouses from receiving retirement benefits from the ATRS in the event of recipients' deaths. Separate Defendants do not dispute that their positions were created by statute or dispute that their official responsibilities are as outlined above. Therefore, this Court finds that Separate Defendants are proper defendants in this suit, and the Court declines to dismiss them as immune from suit under the Eleventh Amendment.

### III.   Separate Defendants' Motion To Dismiss For Failure To State A Claim And Plaintiffs' Motion For Summary Judgment

Separate Defendants also move to dismiss plaintiffs' amended complaint with prejudice for failure to state a claim upon which relief may be granted. Separate Defendants argue that plaintiffs' claims fail under binding precedent. Conversely, plaintiffs move for summary judgment against all defendants as a matter of law.

Pursuant to Federal Rule of Civil Procedure 56(b), unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery. Fed. R. Civ. P. 56(b). The advisory committee's notes to Rule 56 state that a motion for summary judgment may be filed as early as the commencement of an action, although the motion may be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had. Fed. R. Civ. P. 56 advisory committee's notes to 2010 Amendments. In their response to plaintiffs' statement of undisputed material facts, Separate Defendants purport to deny that there are no material facts in

dispute in this case (*See* Dkt. Nos. 24-2, 29).  However, Separate Defendants identify no material facts in dispute when responding to plaintiffs' motion for summary judgment, as required by this Court's Local Rule 56.1.  Further, elsewhere in their response to plaintiffs' statement of undisputed material facts, Separate Defendants "admit" that a ruling on plaintiffs' motion for summary judgment "involves purely legal analysis" (Dkt. No. 29, at 2-3).  Although in their response Separate Defendants assert that plaintiffs' motion for summary judgment is "premature" (Dkt. No. 27, ¶2), Separate Defendants do so because of their pending motion to dismiss which they maintain may moot some or all of the claims addressed in plaintiffs' motion for summary judgment (Dkt. No. 28, at 2 n.1).  Separate Defendants did not request that this Court defer its consideration of plaintiffs' motion for summary judgment under Federal Rule of Civil Procedure 56(d).  Finally, counsel for Separate Defendants agreed with the Court's statement at the hearing on these motions that Separate Defendants oppose plaintiffs' motion for summary judgment on purely legal grounds.

For these reasons, the Court determines that plaintiffs' motion for summary judgment is not premature but is ripe for the Court's consideration.  The Court determines the material facts are uncontested.  As for the motion to dismiss, the Court has considered only those facts alleged in the amended complaint (Dkt. No. 16).  As for the motion for summary judgment, the Court has considered no reports or statements outside of the factual record.  The Court notes Separate Defendants' objections to "Plaintiffs' reliance upon news media reports and statements of outside interest groups" (Dkt. No. 28, at 23).  The Court sustains this objection and has considered no such reports or statements.  Although the legal standard applied by the Court to determine each motion differs, the analyses engaged in by the Court to resolve these two pending motions—a motion to dismiss and a motion for summary judgment—are similar.  Accordingly,

after setting forth the appropriate legal standard for each motion, the Court will consider jointly the merits of the motions.

### A. Standards Of Review

#### 1. Standard:  Motion To Dismiss For Failure To State A Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).

Whether a complaint states a claim is a question of law. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  "[T]he complaint must contain facts which state a claim as a matter of law and must not be conclusory." *Briehl v. General Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999).  Further, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 409 U.S. 319, 326 (1989).  In construing the sufficiency of a complaint, courts consider materials attached to the complaint as exhibits. *Morton*, 793 F.2d at 187.  "When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

### 2.      Standard:  Motion For Summary Judgment

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  Summary judgment is not precluded by disputes over facts that could not, under the governing law, affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue.  *Anderson*, 477 U.S. at 249.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B.      Precedent

Separate Defendants argue that two cases serve as precedent to control the outcome of this case.  The Court will examine each case in turn.

1.      *Baker v. Nelson*

First, Separate Defendants contend that *Baker v. Nelson*, 409 U.S. 810 (1972), requires dismissal of this case.  In *Baker*, the United States Supreme Court summarily dismissed "for want of substantial federal question" an appeal from the Minnesota Supreme Court, which upheld a ban on same-sex marriage.  *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972).  The Minnesota Supreme Court held that a state statute defining marriage as a union between persons of the opposite sex did not violate the First, Eighth, Ninth, or Fourteenth Amendments to the United States Constitution.  *Baker*, 191 N.W.2d at 185-86.

Separate Defendants argue that the Supreme Court's summary dismissal in *Baker* requires dismissal of this action.  "Summary dismissals are, of course, to be taken as rulings on the merits, in the sense that they rejected the specific challenges presented in the statement of jurisdiction and left undisturbed the judgment appealed from."  *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 477 n.20 (1979); *see also Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  A summary dismissal "does not, as we have continued to stress, necessarily reflect our agreement with the opinion of the court whose judgment is appealed."  *Washington*, 439 U.S. at 477 n.20.  Further, "if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise."  *Hicks v. Miranda*, 422 U.S. 332, 344 (1975).

Supreme Court decisions since *Baker* reflect significant "doctrinal developments" concerning constitutional issues that involve same-sex relationships.  *See Kitchen v. Herbert*, 755 F.3d 1193, 1204-05 (10th Cir. 2014).  As the Tenth Circuit noted in *Kitchen*, "[t]wo landmark decisions by the Supreme Court"—*Lawrence v. Texas*, 539 U.S. 558 (2003), and *Windsor*, 133 S. Ct. 2675—"have undermined the notion that the question presented in *Baker* is insubstantial."

755 F.3d at 1205.  In *Lawrence*, the Supreme Court held that "intimate conduct with another person . . . can be but one element in a personal bond that is more enduring.  The liberty protected by the Constitution allows homosexual persons the right to make this choice."  539 U.S. at 567.

In *Windsor*, the Supreme Court struck down a portion of the federal DOMA, which defined marriage as between "one man and one woman" and conflicted with New York's laws permitting same-sex marriage.  133 S. Ct. at 2683, 2689.  This Court recognizes that *Windsor* did not explicitly invalidate state same-sex marriage bans, as that issue was not squarely before the Supreme Court.  Nevertheless, *Windsor* did not rest solely on federalism concerns.  The *Windsor* Court maintained that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons, but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States."  *Id.* at 2693 (citations omitted).

Accordingly, although states maintain the power to regulate domestic relationships, they must do so "subject to," and within the confines of, "the constitutional rights of persons."  As to the "constitutional rights of persons," the *Windsor* Court framed its central issue as "whether the resulting injury and indignity [caused by DOMA] is a deprivation of an essential part of the liberty protected by the Fifth Amendment."  *Id.* at 2692; *accord Kitchen*, 755 F.3d at 1206.  The Court concluded:  "DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution," and "the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved."  *Windsor*, 133 S. Ct. at 2695.  The Supreme Court reinforced

that restricting the benefits of marriage to same-sex couples "violates basic due process and equal protection principles." *Id.* at 2693.

At the very least, the Supreme Court's decisions in *Lawrence* and *Windsor* "foreclose the conclusion that the issue [of same-sex marriage] is, as *Baker* determined, wholly insubstantial." *Kitchen*, 755 F.3d at 1208.  Although the Eighth Circuit Court of Appeals has not yet determined the issue, several federal courts of appeals that have considered *Baker*'s impact in the wake of *Lawrence* and *Windsor* have concluded that *Baker* does not bar a federal court from considering the constitutionality of a state's ban on same-sex marriage.  *See, e.g.*, *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014); *Kitchen*, 755 F.3d 1193 (10th Cir. 2014); *Latta v. Otter*, Nos. 14-35420, 14-35421, 12-17668, 2014 WL 4977682, at *3 (9th Cir. Oct. 7, 2014); *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014).  *But see DeBoer v. Snyder*, Nos. 14-1341, 3057, 3464, 5291, 5297, 5818, 2014 WL 5748990, at *7 (6th Cir. Nov. 6, 2014) (finding that *Windsor* neither overruled *Baker* "by name" nor "by outcome").  Numerous lower federal courts also have questioned whether *Baker* serves as binding precedent following the Supreme Court's decision in *Windsor*.  This Court has the benefit of reviewing the decisions of those courts, and "[a] significant majority of courts have found that *Baker* is no longer controlling in light of the doctrinal developments of the last 40 years."  *Rosenbrahn v. Daugaard*, No. 4:14-CV-04081-KES, 2014 WL 6386903, at *6-7 n.5 (D.S.D. Nov. 14, 2014) (collecting cases that have called *Baker* into doubt).

This Court acknowledges that some courts have recently concluded that *Baker* is still binding precedent.  *See, e.g.*, *DeBoer*, 2014 WL 5748990.  This Court determines that the Sixth Circuit's reasoning is not as persuasive on this point as that of the Fourth, Seventh, Ninth, and Tenth Circuits.  As an initial matter, the summary disposition in *Baker* is not of the same

23

precedential value as would be an opinion on the merits. *Tully v. Griffing, Inc.*, 429 U.S. 68, 74 (1976). Further, it is difficult to reconcile the Supreme Court's statement in *Windsor* that the Constitution protects the moral and sexual choices of homosexual couples, *Windsor*, 133 S. Ct. at 2694, with the idea that state laws prohibiting same-sex marriage do not present a substantial federal question. For the foregoing reasons, *Baker* does not bar the Court from reaching the merits of plaintiffs' claims.

### 2.    *Citizens for Equal Protection, Inc. v. Bruning*

Separate Defendants next argue that *Citizens for Equal Protection, Inc. v. Bruning*, 455 F.3d 859 (8th Cir. 2006), "specifically held that an equal protection challenge to Nebraska's marriage laws fails on the merits" and, thus, requires dismissal of the instant case (Dkt. No. 18, at 20). In *Bruning*, three public interest groups whose members included gay and lesbian citizens challenged, and the Eighth Circuit upheld, a Nebraska constitutional amendment that defined marriage as "between a man and a woman" and prohibited any "civil union, domestic partnership, or other similar same-sex relationship." 455 F.3d at 863. Although similar to the case at hand on the surface, *Bruning* does not dispose of plaintiffs' challenge to Arkansas's marriage laws.

First, *Bruning* recognized the Supreme Court's summary dismissal in *Baker*, stating that "to our knowledge no Justice of the Supreme Court has suggested that a state statute or constitutional provision codifying the traditional definition of marriage violates the Equal Protection Clause or any other provision of the United States Constitution." *Id.* at 870. The *Bruning* court, however, did not discuss the continued validity of *Baker* or the doctrinal development exception. Moreover, *Bruning* was decided in 2006, seven years before the Supreme Court decided *Windsor*. As discussed above, *Lawrence* and *Windsor* present doctrinal

developments that undercut *Baker*'s control.  Thus, to the extent that *Bruning* cites *Baker*, for the

reasons stated above in this Court's analysis of *Baker*, doubt is cast on the ability of *Bruning* to

control the outcome here.

More importantly, however, the present case involves claims and arguments that are

distinguishable substantively from those decided in *Bruning*.  The court in *Bruning* did not

decide a due process challenge to Nebraska's marriage laws; therefore, that case does not resolve

plaintiffs' due process arguments here, despite Separate Defendants' arguments to the contrary.

As to the equal protection arguments, it is true that the *Bruning* court stated that "Appellees'

equal protection argument [against Nebraska's constitutional amendment] fails on the merits."

*Id.* at 868-69.  But, as the court in *Bruning* noted, the equal protection argument at issue in that

case was limited:

> Appellees argue that [Nebraska's constitutional amendment] violates the Equal
> Protection Clause because it raises an insurmountable political barrier to same-sex
> couples obtaining the many governmental and private sector benefits that are
> based upon a legally valid marriage relationship.  *Appellees do not assert a right
> to marriage or same-sex unions.*  Rather, they seek "a level playing field, an equal
> opportunity to convince the people's elected representatives that same-sex
> relationships deserve legal protection."

*Id.* at 865 (emphasis added).  Accordingly, to decide which standard of review applied, the

*Bruning* court evaluated cases dealing with claims for "equal political access."  *See id.* at 866

(internal quotation marks omitted).  The Eighth Circuit rejected plaintiffs' argument for

heightened scrutiny, noting that "there is no fundamental right to be free of the political barrier a

validly enacted constitutional amendment erects" and that the *Bruning* plaintiffs "d[id] not assert

a right to marriage or same-sex unions."  *Id.* at 868.  For these reasons, this Court does not

construe *Bruning* or its holding as broadly as Separate Defendants suggest.

Unlike the appellees' claims in *Bruning*, plaintiffs' claims here assert, within the Fourteenth Amendment to the United States Constitution, a fundamental right to marry under the Due Process Clause and the freedom to exercise that right like other citizens do under the Equal Protection Clause, a fundamental right to travel under the Due Process Clause, and discrimination on the basis of gender in violation of the Equal Protection Clause.   Therefore, because the *Bruning* court was not asked to address and did not address these legal claims, the holding of *Bruning* does not require this Court to dismiss plaintiffs' right to marry, right to travel, and gender discrimination claims.   *See Rosenbrahn*, 2014 WL 6386903 (examining the limits of *Bruning* in the context of a challenge to South Dakota's marriage laws); *Lawson v. Kelly*, No. 14-0622-CV-W-ODS, 2014 WL 5810215, at *8-10 (W.D. Mo. Nov. 7, 2014) (examining the limits of *Bruning* in the context of a challenge to Missouri's marriage laws). Instead, this Court must determine whether plaintiffs' asserted right to marry states a valid liberty interest and, if it does, whether the government may interfere with the right to marry by restricting it to opposite-sex couples; whether the government has interfered with plaintiffs' asserted right to travel; and whether plaintiffs have been discriminated against on the basis of gender.   However, regarding plaintiffs' discrimination on the basis of sexual orientation claim, the Court determines, and plaintiffs appear to agree, that it is bound by *Bruning*, as discussed below.

### C.   Claims Under The Fourteenth Amendment To The United States Constitution

Plaintiffs state six claims in their complaint:  (1) deprivation of the fundamental right to marry; (2) deprivation of a liberty interest in valid marriages enacted in other states; (3) deprivation of autonomy, family privacy, and association; (4) deprivation of the fundamental right to travel; (5) discrimination on the basis of sexual orientation; and (6) discrimination on the

basis of gender.   The only claims discussed by all parties' briefings are those concerning a fundamental right to marry, the right to travel, discrimination based on sexual orientation, and discrimination based on gender.   The Court discusses below the claims and issues that have been fully briefed.

### 1.        Alleged Deprivation Of The Fundamental Right To Marry

The Due Process Clause of the Fourteenth Amendment "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."   *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("The [Due Process] Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests.").   The first step in this substantive due process analysis is to determine if an asserted right or liberty interest is fundamental.   *See Glucksberg*, 521 U.S. at 719-20.   The Due Process Clause safeguards "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."   *Id.* at 720 (internal citations and quotation marks omitted).

As to the right to marry, the Supreme Court has been clear:   "the 'liberty' specially protected by the Due Process Clause includes the right[] to marry . . . ."   *Id.*   "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.   Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival."   *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)).   "[O]ur past decisions make clear that the right to marry is of fundamental importance . . . ."   *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978).

Separate Defendants argue that plaintiffs' asserted right to marry does not provide "a careful description of the asserted fundamental liberty interest," as required by *Glucksberg*, 521 U.S. at 721. Separate Defendants maintain that plaintiffs must describe their asserted right as one for "same-sex marriage," and that any such right cannot be fundamental and, therefore, cannot get heightened protection because same-sex marriage is not deeply rooted in this nation's history and tradition. This argument is unpersuasive for several reasons. As the Supreme Court has stated, "the right to marry is of fundamental importance for all individuals." *Zablocki*, 434 U.S. at 384. The Supreme Court's previous decisions heralding the "right to marry" as fundamental do not describe that right with any more specificity. *See Kitchen*, 755 F.3d at 1210 ("In numerous cases, the Court has discussed the right to marry at a broader level of generality . . . ."). In fact, even *Glucksberg*—in wake of its "careful description" requirement—described an unrestricted "right to marry" as fundamental. 521 U.S. at 719-20.

Further, in *Loving*, the Supreme Court held unconstitutional laws that prohibited interracial marriage because such laws violated "the freedom of choice to marry." 388 U.S. at 4. As the Supreme Court noted in later cases, the *Loving* Court struck these anti-miscegenation laws despite the fact that our nation's history and tradition rejected outright interracial marriages. *See Lawrence*, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack."); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847-48 (1992) ("Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th Century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference").

Although *Loving* involved a heterosexual couple, Supreme Court precedents also characterize the "right to marry" as distinct and independent from the right to procreate,

revealing that the "right to marry" does not inherently hinge on a couple's ability to produce children.  *See Kitchen*, 755 F.3d at 1211; *see also Turner v. Safley*, 482 U.S. 78 (1987) (invalidating a prison rule that barred inmates who had not procreated from marrying and holding that inmates could enjoy "[m]any important attributes of marriage," such as "expressions of emotional support and public commitment," "spiritual significance," and "receipt of government benefits").

These cases underscore that the drafters of the Fifth and Fourteenth Amendments "knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress.  As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."  *Lawrence*, 539 U.S. at 579.  Accordingly, this Court finds that the Jernigans and Austins have adequately described their asserted right to marry.  Directed by Supreme Court and Eighth Circuit precedents, this Court concludes that the right to marry is a fundamental right.  *Glucksberg*, 521 U.S. at 720; *Safley v. Turner*, 777 F.2d 1307, 1313 (8th Cir. 1985) ("It is well settled that the decision to enter into a marital relationship is a fundamental human right.") *aff'd in part, rev'd in part*, 482 U.S. 78, 100 (1987) ("[T]he judgment of the Court of Appeals striking down the Missouri marriage regulation is affirmed . . . .").

Because the Arkansas marriage laws restrict the Jernigans and Austins' fundamental right to marry, these laws are subject to strict scrutiny.  This standard for examining the Arkansas laws at issue, which significantly interfere with a fundamental right, is consistent with what the Supreme Court has said in past cases.  Nevertheless, "[b]y reaffirming the fundamental character of the right to marry, [the Court] do[es] not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous

scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may be legitimately imposed." *Zablocki*, 434 U.S. at 386. In *Zablocki*, in his concurrence, Justice Stewart explained that a State may significantly interfere with or even prohibit marriage if the regulation doing so passes strict scrutiny: "for example, a State may legitimately say that no one can marry his or her sibling, that no one can marry who is not at least 14 years old, that no one can marry without first passing an examination for venereal disease, or that no one can marry who has a living husband or wife." *Id.* at 392 (Stewart, J., concurring); *see also Bruning*, 455 F.3d at 867. Justice Stewart also recognized, however, that "just as surely, in regulating the intimate human relationship of marriage, there is a limit beyond which a State may not constitutionally go." *Zablocki*, 434 U.S. at 392 (Stewart, J., concurring); s*ee also Lawson*, 2014 WL 5810215, at *6-7 (discussing other state regulations on marriage examined and upheld by the Supreme Court).

This Court finds that the Arkansas marriage laws at issue here overstep this constitutional limit. The Due Process Clause prevents the government from infringing upon a fundamental right "unless the infringement is narrowly tailored to serve a compelling state interest." *Reno*, 507 U.S. at 302. Likewise, under the Equal Protection Clause, if a state makes a classification that "impinge[s] upon the exercise of a fundamental right," then the state must "demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217 (1982).

Strict scrutiny "entail[s] a most searching examination" and requires "the most exact connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (internal quotations omitted). Under this standard, the government "cannot rest upon a generalized assertion as to the classification's relevance to its goals." *Richmond v. J.A. Croson*

*Co.*, 488 U.S. 469, 500 (1989). Heightened scrutiny requires the government's "justification [to] be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003).

> Separate Defendants suggest several reasons to uphold Arkansas's marriage laws:
>
> (1) the basic premise of the referendum process, which is that political power flows from the people to their government on issues of vital importance to the public; (2) advancement of procreation by encouraging the development of biologically procreative relationships; (3) ensuring the best interests of children through laws where children born as a result of a union between a man and a woman are cared for by their biological parents in a stable family environment; (4) stability, uniformity, and continuity of laws in the face of an ongoing public and political debate about the nature and role of marriage; (5) preservation of the public purposes and social norms linked to the historical and deeply-rooted meaning of marriage; and (6) a cautious, historical approach to governmental social experimentation as democratic, cultural and scientific discussions proceed.

(Dkt. No. 28, at 8-9).[2]

Several of these reasons are prudential. Separate Defendants' first and sixth rationales laud the state's referendum process, principles of federalism, and the importance of democratic decision making for "social experimentation," and the fourth rationale points to the need for stability amidst the "ongoing public and political debate." This Court does not take lightly a request to declare that a state law is unconstitutional. Statutes are passed by the duly elected representatives of the people. It is not on a whim that the Court supplants the will of the voters

---

[2] Separate Defendants claim that, in addition to these identified state interests, "any other conceivable rational basis[] is sufficient to affirm constitutionality of Amendment 83 and Act 144 of 1997" (Dkt. No. 28, at 10). Because the Court determines a higher degree of scrutiny is required, the Court declines to address justifications the State has not specifically advanced in support of the Arkansas laws.

or the decisions of the legislature.  Even so, these interests do not address any specific reasons for the marriage laws at issue; instead, they represent the type of generalized, *post hoc*, and litigation-reactive justifications that strict scrutiny disallows.

Further, although important in other contexts, these rationales can neither justify infringement of fundamental rights nor strip this Court of the "'duty to decide all cases within [its] jurisdiction that are brought before [it], including controversial cases that arouse the most intense feelings in the litigants.'"  *Kitchen*, 755 F.3d at 1228 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).  The Court reminds Separate Defendants that the Constitution is also an expression of the people's will, and these rationales contradict the very fabric and structure of the Constitution's protections of individual rights against majoritarian and governmental overreach. The fact that Amendment 83 was adopted by referendum does not immunize it from federal constitutional scrutiny.  As the Supreme Court has explained:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, and the City may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic." (citation omitted)); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 839 F.2d 1296, 1303 (8th Cir. 1988); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 981 (S.D. Ohio 2013).

Likewise, Separate Defendants' fourth rationale—stability, uniformity, and continuity of laws—provides no rationale at all where those laws are unconstitutional. *See Palmer v. Thompson*, 403 U.S. 217, 226 (1971) ("Citizens may not be compelled to forgo their constitutional rights because officials fear public hostility . . . .").

As for Separate Defendants' federalism arguments, the Court noted above *Windsor*'s stance: "State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States." *Windsor*, 133 S. Ct. at 2691. Further, "[o]ur federalist structure is designed to 'secure[] to citizens the liberties that derive from the diffusion of sovereign power' rather than to limit fundamental freedoms." *Kitchen*, 755 F.3d at 1229 (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)). Arkansas undoubtedly may define and regulate the "incidents, benefits, and obligations" of domestic relationships within its borders, *Windsor*, 133 S. Ct. at 2692, but these regulations must comport with the United States Constitution, *id.*, and it is this Court's duty to examine Arkansas's marriage laws against the United States Constitution's guarantee of individual liberties and protection of fundamental rights.

Separate Defendants' other rationales focus on connections between marriage and procreation and the interests of children. These rationales run afoul of the basic tenets of the state's marriage system, one that does not distinguish procreative from non-procreative couples. Further, the Supreme Court has held that married couples have a right not to procreate and that the Constitution protects the right of individuals to marry regardless of their ability or desire to procreate, including those who are elderly, infertile, and incarcerated. *See Lawrence*, 539 U.S. at 604 (Scalia, J., dissenting) ("[W]hat justification could there possibly be for denying the benefits

of marriage to homosexual couples exercising the liberty protected by the Constitution?  Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry." (quotations omitted)); *Turner*, 482 U.S. at 96 (declaring "a constitutionally protected marital relationship in the prison context" even when a couple may not birth a child); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965) (holding that married couples have a right to use contraception).

According to Separate Defendants, Arkansas's marriage laws prevent consenting adult same-sex couples from marrying because homosexuals cannot procreate.  But, as illustrated above, Arkansas law allows others who cannot procreate to marry.  As the Tenth Circuit stated, "[s]uch a mismatch between the class identified by a challenged law and the characteristic allegedly relevant to the state's interest is precisely the type of imprecision prohibited by heightened scrutiny."  *Kitchen*, 755 F.3d at 1219 (citing *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)).  Further, "[a] state may not impinge upon the exercise of a fundamental right as to some, but not all, of the individuals who share a characteristic urged to be relevant."  *Id.*  This is the bedrock of the Constitution's guarantee of due process and equal protection, and the Supreme Court has acknowledged such:

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.  Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.

*Eisenstadt v. Baird*, 405 U.S. 438, 454 (1972).

Separate Defendants' third rationale—that the state's marriage laws "ensur[e] the best interests of children" because "children born as a result of a union between a man and a woman

are cared for by their biological parents in a stable family environment"—fails for several reasons.   First, Separate Defendants have not explained how allowing same-sex marriage between two consenting adults will at all prevent heterosexual spouses from caring for their biological children.   This rationale also ignores Arkansas's adoption laws, which declare that even "[a]n unmarried adult" may adopt and that "any individual may be adopted."   Ark. Code Ann. §§ 9-9-204, -203.   Moreover, Arkansas law currently allows individuals in same-sex relationships to adopt.   See Ark. Dep't of Human Servs. v. Cole, 380 S.W.3d 429, 431, 443 (Ark. 2011); cf. Dep't of Human Servs. & Child Welfare Agency Review Bd. v. Howard, 238 S.W.3d 1 (Ark. 2006).   In Cole, the Arkansas Supreme Court struck down as unconstitutional Arkansas Code Annotated § 9-8-304, which prohibited individuals "cohabiting with a sexual partner outside of a marriage that is valid under the Arkansas Constitution and the laws of this state" from adopting or serving as a foster parent.   Cole, 380 S.W.3d at 431 (quoting the language of Ark. Code Ann. § 9-8-304(a)).   This statute "applie[d] equally to cohabiting opposite-sex and same-sex individuals."   Id.   (quoting the language of Ark. Code Ann. § 9-8-304(b)).   Further, in Howard, the Arkansas Supreme Court held as unconstitutional on separation of powers grounds a regulation of the Child Welfare Agency Review Board that stated, in pertinent part, "[N]o person may serve as a foster parent if any adult member of that person's household is a homosexual."   Howard, 238 S.W.3d at 3.

Separate Defendants' fifth rationale—preserving the "purposes and social norms linked to the historical and deeply-rooted meaning of marriage"—also appears to generalize their stated interests in procreation and child rearing.   This rationale neither indicates any separate "purposes" for banning same-sex marriage between consenting adults apart from those discussed above nor shows how same sex marriage endangers these unspecified purposes.   As a standalone

interest, "'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples."  *Lawrence*, 539 U.S. at 601 (Scalia J., dissenting).  "Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy [even] rational basis review under the Equal Protection Clause," much less strict scrutiny.  *Lawrence*, 539 U.S. at 582.

As demonstrated, a most searching examination of Separate Defendants' proposed reasons for Arkansas's marriage laws reveals that these laws are not narrowly tailored to achieve a compelling state interest.  The bases Separate Defendants suggest for upholding Amendment 83 and the challenged statutes, primarily encouraging procreation and ensuring the best interests of children, in addition to the laws' mismatched means, do not withstand strict scrutiny.  This Court finds that the principal purpose of Amendment 83 and the challenged statutes "is to impose inequality, not for other reasons like governmental efficiency."  *Windsor*, 133 S. Ct. at 2694.  Amendment 83 of the Arkansas Constitution and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208 unconstitutionally deny consenting adult same-sex couples their fundamental right to marry in violation of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Therefore, this Court denies Separate Defendants' motion to dismiss and grants plaintiffs' motion for summary judgment as to plaintiffs' claim that the Arkansas laws at issue deny consenting adult same-sex couples their fundamental right to marry in violation of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Given the Court's determination on this issue, the Court declines to reach plaintiffs' claim alleging a liberty interest protected by the Due Process and the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution (Dkt. No. 16, at 14-15), a claim

which neither party specifically briefed in its motions, and plaintiffs' claim alleging a right to autonomy, family privacy, and association under the Due Process Clause of the Fourteenth Amendment to the United States Constitution (Dkt. No. 16, at 15-16), a claim Separate Defendants' addressed in their pending motion to dismiss (Dkt. No. 18, at 21-23) but to which plaintiffs did not respond specifically.  The Court dismisses these two claims.

### 2.    Alleged Deprivation Of The Fundamental Right To Travel

The United States Supreme Court has declared that "the constitutional right to travel from one State to another is firmly embedded in [this country's] jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999).  This right to travel has three components.  As the Supreme Court has stated:

> [The right to travel] protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Id.* at 500.  "Because travel is a fundamental right, 'any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional.'" *Minn. Senior Fed'n v. United States*, 273 F.3d 805, 809 (8th Cir. 2001) (emphasis in original) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)).

In this case, the Jernigans argue that Arkansas has restricted their right to travel by not recognizing the marital status they obtained in Iowa.  As an initial matter, as the Court understands the undisputed facts, the Jernigans traveled to Iowa to marry but were at all times citizens and residents of Arkansas.  For this reason, the Court questions whether the Jernigans have standing to raise this claim.  Regardless, the Jernigans have not shown that Arkansas's marriage laws treat homosexual couples who are new citizens or attempting to become citizens

of Arkansas any differently than the State treats homosexual couples who were citizens of Arkansas.  The Jernigans have presented no evidence that defendants have applied Arkansas's marriage laws to recognize the homosexual marriages of other citizens while refusing to recognize the Jernigans' marriage.  Further, the Jernigans were existing citizens of Arkansas prior to receiving their marriage license in Iowa.  Arkansas has refused to recognize the Jernigans' marriage because it is a same-sex marriage, not because of the individuals' citizenship.

The Jernigans also have failed to show that Arkansas's marriage laws violate the other components of the right to travel.  The Jernigans do not argue that Arkansas's marriage laws impose any actual obstacle on travelling to Arkansas.  For example, the Supreme Court has held that it was impermissible to deter through durational residency requirements the migration of needy persons by imposing a year-long prohibition on welfare assistance, *see Shapiro*, 394 U.S. 618, or on hospital care, *see Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974). When a new resident receives benefits at the same level as other residents of the state, it is not a penalty that those benefits are less generous than benefits in other states.  *See Minn. Senior Fed'n*, 273 F.3d at 810.  The fact that Arkansas's marriage laws treat the Jernigans like other homosexual citizens of the state of Arkansas proves that these laws do not impermissibly penalize the Jernigans' right to travel.  Therefore, the Court grants Separate Defendants' motion to dismiss and denies plaintiffs' motion for summary judgment as to plaintiffs' claims that Arkansas's marriage laws deprive them of their fundamental right to travel.

### 3.    Alleged Discrimination On The Basis Of Sexual Orientation

Plaintiffs assert that Arkansas's laws defining marriage as between a man and a woman violate the Equal Protection Clause by discriminating on the basis of sexual orientation.  As

discussed above, the Court agrees with Separate Defendants that *Bruning* is controlling law with respect to this claim.

In *Bruning*, the Eighth Circuit held that "the Supreme Court has never ruled that sexual orientation is a suspect classification for equal protection purposes" and then applied rational-basis review. *Bruning*, 455 F.3d at 866-67; *see Rosenbrahn*, 2014 WL 6386903, at *11; *Lawson*, 2014 WL 5810215, at *5. Thus, the Court must find sexual orientation not to be a suspect class and apply rational-basis review to this claim. The Eighth Circuit also expressed clearly its belief that laws prohibiting same-sex marriage would pass rational-basis review based on many of the same rationales advocated by Separate Defendants here. *Bruning*, 455 F.3d at 867-68; *see Lawson*, 2014 WL 5810215, at *5. Accordingly, this Court is bound to grant Separate Defendants' motion to dismiss and deny plaintiffs' motion for summary judgment as to plaintiffs' claim of discrimination on the basis of sexual orientation.

### 4.    Alleged Discrimination On The Basis Of Gender

Plaintiffs assert that Arkansas's laws defining marriage as between a man and a woman violate the Equal Protection Clause by discriminating on the basis of gender. Separate Defendants again primarily argue that this claim is foreclosed by the Eighth Circuit's decision in *Bruning*, 455 F.3d 859. The Court disagrees. As discussed above, *Bruning* does not control with respect to this claim. *See Lawson,* 2014 WL 5810215, at *5 ("*Bruning* did not consider—*because it was not asked to consider*—whether there is a constitutional right to same-sex marriage, either because laws forbidding it burden a fundamental right or draw impermissible distinctions based on gender.").

Separate Defendants also argue in passing that plaintiffs were not treated differently on the basis of their gender, but they do not develop this argument. The Court disagrees and finds

that Arkansas's restriction on same-sex marriage is a classification on the basis of gender because only men may marry men and only women may marry women. *See Latta*, 2014 WL 4977682, at *14 (Berzon, J., concurring) ("But for their gender, plaintiffs would be able to marry the partners of their choice."); *Rosenbrahn*, 2014 WL 6386903, at *10 ("Because South Dakota's law, for example, prohibits a man from marrying a man but does not prohibit that man from marrying a woman, the complaint has stated a plausible claim for relief."  (citation omitted)); *Lawson*, 2014 WL 5810215, at *8 ("The State's permission to marry depends on the genders of the participants, so the restriction is a gender-based classification.").

That Arkansas's restriction on same-sex marriage imposes identical disabilities on men and women does not foreclose a claim that the laws discriminate based on gender.  In *Loving*, the Supreme Court rejected the argument that anti-miscegenation statutes did not discriminate based on race because the statutes applied equally to African Americans and Caucasians.  *Loving*, 388 U.S. at 8.  That rationale applies here as well.  *See Latta*, 2014 WL 4977682, at *17 (Berzon, J., concurring) ("[I]t is simply irrelevant that the same-sex marriage prohibitions privilege neither gender as a whole or on average.  Laws that strip *individuals* of their rights or restrict personal choices or opportunities solely on the basis of the individuals' gender are sex discriminatory . . . .").

Restrictions based on gender are subject to intermediate scrutiny.  "The burden of justification is demanding and it rests entirely on the State."  *Virginia*, 518 U.S. at 533.  "The State must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718,

724 (1982)) (internal quotation marks omitted).   "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."   *Id.*

For the reasons discussed above regarding strict scrutiny, Separate Defendants' proposed reasons for Arkansas's marriage laws do not satisfy Separate Defendants' burden under intermediate scrutiny.   Accordingly, the Court finds that Amendment 83 of the Arkansas Constitution and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208 impose unconstitutional classifications on the basis of gender in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.   The Court denies Separate Defendants' motion to dismiss and grants plaintiffs' motion for summary judgment on plaintiffs' discrimination on the basis of gender claim.

## IV.   Remedy

The Court declares that Arkansas's marriage laws—Amendment 83 of the Arkansas Constitution and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208—violate the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by precluding same-sex couples from exercising their fundamental right to marry in Arkansas, by not recognizing valid same-sex marriages from other states, and by discriminating on the basis of gender.

The Jernigans and Austins request that this Court enjoin defendants from enforcing Amendment 83 and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208 in a manner that denies plaintiffs the ability to marry in Arkansas or to have their valid out-of-state marriages recognized in Arkansas.   The Jernigans separately request the Court to enter an injunction against Richard Weiss in his official capacity as Director of the Arkansas DFA and George Hopkins in his official capacity as Executive Director of the ATRS.   Specifically, the Jernigans,

who are validly married under Iowa law, ask this Court to enjoin Director Weiss from denying the Jernigans' joint tax returns and to enjoin Executive Director Hopkins from denying spousal benefits to Pam Jernigan according to the ATRS retirement plan.

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). When determining whether to grant a motion for a preliminary injunction, this Court considers: (1) the threat of irreparable harm to the movant; (2) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; (3) the public interest; and (4) the movant's likelihood of success on the merits. *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 114 (8th Cir. 1981).

The Court finds that the Jernigans and Austins are entitled to permanent injunctive relief. As stated above, this Court declares that Arkansas's marriage laws violate the Fourteenth Amendment to the United States Constitution. Therefore, the Jernigans and Austins have attained success on the merits as required for obtaining a permanent injunction. *See Guttau*, 190 F.3d at 847. The Court also finds that the Jernigans and Austins have met the other *Dataphase* factors. The Jernigans and Austins' inability to exercise their fundamental right to marry has caused them irreparable harm which outweighs any injury to defendants. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that deprivation of constitutional rights "unquestionably constitutes irreparable harm."). Moreover, as the Eighth Circuit has stated, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). Therefore, the Jernigans and Austins have met their burden for issuance of a permanent injunction.

Separate Defendants argue that the Jernigans and Austins may not seek to enjoin state officials from enforcing state laws.  In support of that argument, Separate Defendants cite *Massachusetts State Grange v. Benton*, 272 U.S. 525 (1926).  "[N]o injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury."  *Id.* at 527.  The Court is satisfied that the defendants are clothed with authority to enforce the laws in question, that this case is reasonably free from doubt, and that an injunction is necessary to prevent the irreparable injury to the Jernigans and Austins.

In accordance with the Supreme Court's issuance of a stay in *Herbert v. Kitchen*, 134 S. Ct. 893 (2014), of a district court's injunction against enforcement of state marriage laws prohibiting same-sex marriage, this Court stays execution of this injunction pending the final disposition of any appeal to the Eighth Circuit Court of Appeals.  If no timely notice of appeal is filed, this injunction shall take immediate effect upon the expiration of the time for filing a notice of appeal.  *See, e.g.*, *Bostic v. Rainey*, 970 F. Supp. 2d 456, 484 (E.D. Va.), *aff'd*, 760 F.3d 352 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 286 (2014); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1297 (N.D. Okla.), *aff'd*, 760 F.3d 1070 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 271 (2014).

## V.     Conclusion

For the foregoing reasons, the Court grants in part and denies in part Separate Defendants' motion to dismiss (Dkt. No. 17) and plaintiffs' motion for summary judgment (Dkt. No. 24).  The Court grants in part plaintiffs' request for declaratory and injunctive relief and stays execution of the injunction pending the final disposition of any timely appeal to the Eighth

Circuit Court of Appeals or until the time for filing a notice of appeal expires.  Specifically, the Court:

1.  Finds that all defendants were properly and timely served with plaintiffs' amended complaint;

2.  Determines that this Court should not abstain from exercising its jurisdiction;

3.  Determines that Separate Defendants are proper defendants in this suit and declines to dismiss them as immune from suit under the Eleventh Amendment;

4.  Determines that *Baker v. Nelson*, 409 U.S. 810 (1972), does not foreclose this Court's consideration of the merits of plaintiffs' claims;

5.  Determines that *Citizens for Equal Protection, Inc. v. Bruning*, 455 F.3d 859 (8th Cir. 2006), does not foreclose this Court's consideration of the merits of certain of plaintiffs' claims;

6.  Determines that Amendment 83 of the Arkansas Constitution and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208 restrict the Jernigans and Austins' fundamental right to marry and that the arguments advanced by Separate Defendants in support of such laws do not survive strict scrutiny, meaning the laws unconstitutionally deny consenting adult same-sex couples their fundamental right to marry in violation of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

7.  Declines to reach and dismisses plaintiffs' claims alleging a liberty interest protected by the Due Process and the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and claims alleging a right to autonomy, family

privacy, and association under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

8. Determines that, because Arkansas's marriage laws treat the Jernigans like other homosexual citizens of the state of Arkansas, the laws do not impermissibly penalize the Jernigans' right to travel;

9. Determines that, based on the holding of *Citizens for Equal Protection, Inc. v. Bruning*, 455 F.3d 859 (8th Cir. 2006), and certain of the arguments advanced here, the Court must find sexual orientation not to be a suspect class, apply rational-basis review to that claim, and abide by the Eighth Circuit precedent clearly expressing that such laws would pass rational-basis review based on many of the same rationales advocated by Separate Defendants here, *Bruning*, 455 F.3d at 867-68; *see Lawson*, 2014 WL 5810215, *5;

10. Determines that Amendment 83 of the Arkansas Constitution and Arkansas Code Annotated §§ 9-11-107, 9-11-109, and 9-11-208 are restrictions based on gender and that the arguments advanced by Separate Defendants in support of such laws do not survive intermediate scrutiny, meaning these laws impose unconstitutional classifications on the basis of gender in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

It is so ordered this 25th day of November 2014.

_____
Kristine G. Baker
United States District Judge